**James R. PIPER and Thomas P. Johnston, Appellants,**

**v.**

**The ATOMIC ENERGY COMMISSION, Appellee.**

**Patent Appeal No. 9071.**

United States Court of Customs and Patent Appeals.

Sept. 26, 1974.

Rehearing Denied Nov. 21, 1974.

Markey, C. J., concurred in result and filed opinion.

Rich, J., dissented and filed opinion.

Robert H. Berdo, Alfred N. Goodman, Washington, D. C., attys of record, for appellants; Walter C. Farley, D. C. Roylance, Washington, D. C. (Roylance, Abrams, Berdo & Kaul, Washington, D. C.) of counsel.

J. A. Horan, Washington, D. C., atty of record, for appellee, Randall G. Erdley, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

MILLER, Judge.

This is an appeal from the final order of the Patent Office Board of Patent Interferences in a proceeding to determine the right of the Atomic Energy Commission (AEC) to have a patent issued to it instead of to the inventors or their assignee, under section 152 of the Atomic Energy Act of 1954, as amended (42 U. S.C. § 2182). The board held that the AEC was entitled to direct the Commissioner of Patents to issue the patent to it. We reverse.

Section 152 provides, in part, as follows:

> Any invention or discovery, useful in the production or utilization of special nuclear material or atomic energy, made or conceived in the course of or under any contract, subcontract, or arrangement entered into with or for the benefit of the Commission, regardless of whether the contract, subcontract, or arrangement involved the expenditure of funds by the Commission, shall be vested in, and be the property of, the Commission, except that the Commission may waive its claim to any such invention or discov-

ery under such circumstances as the Commission may deem appropriate, consistent with the policy of this section. No patent for any invention if on discovery, useful in the production or utilization of special nuclear material or atomic energy, shall be issued unless the applicant files with the application . . . a statement under oath setting forth the full facts surrounding the making or conception of the invention or discovery . . . . The Commissioner of Patents shall as soon as the application is otherwise in condition for allowance forward copies of the application and the statement to the Commission.

The Commissioner of Patents may proceed with the application and issue the patent to the applicant (if the invention or discovery is otherwise patentable) unless the Commission, within 90 days after receipt of copies of the application and statement, directs the Commissioner of Patents to issue the patent to the Commission . . . .

 * * * * * *

In our view, the decisive question is whether the language in section 152, "useful in the production or utilization of special nuclear material or atomic energy," reaches appellants' invention, which is described below.

### The Invention

Involved here is the patent application of Piper et al., serial No. 784,231, filed December 16, 1968, for "Antiradiation Agents." The application claims certain chemical compounds stated to be useful as antiradiation agents, the disclosure of utility being as follows:

Such compounds are potentially useful in several different areas. Thus, for example, in X-ray therapy it is desirable to provide a drug which can be administered to a subject and which will then provide protection against the harmful effects of X-ray radiation. Antiradiation agents may also be useful in providing protection against other sources of harmful radiation such as may be encountered by personnel in the fringe areas of a nuclear explosion or by space travelers.

The application discloses that the claimed compounds were tested on mice by peritoneal injection of solutions or suspensions of the drugs and then exposing the mice so treated to "lethal radiation, i. e., 825 roentgens of X-rays or 950 to 1050 roentgens of gamma rays." It is stated that no uninjected control mice survived for 30 days, whereas various percentages of the treated mice survived for 30 days according to the drugs administered and the size of the doses. It is assumed that the disclosure of utility of the claimed compounds as antiradiation agents was found sufficient inasmuch as that is the only utility disclosed and the application was allowed. The invention was developed in the course of a contract between appellants' employer and the U. S. Army Medical Research and Development Command. That the contract was for the benefit of the AEC for purposes of section 152 is not at issue.

### Proceedings Below

Subsequent events were in accordance with procedures under section 152. The Patent Office first called on the applicants to file a statement under oath or a declaration disclosing the circumstances under which the invention was made, because it appeared to be "useful in the production or utilization of special nuclear material or atomic energy." Applicants filed such a declaration, which showed that the invention was made by them as employees of Southern Research Institute under a contract it had with the U. S. Army Medical Research and Development Command, No. DA–49–193–MD–2028, for the synthesis of potential antiradiation drugs. At the same time, applicants' attorneys argued that the compounds claimed in the application are not "useful in the production or utilization of special nuclear material or atomic energy" within the meaning of section 152 and that the AEC should,

therefore, have no interest in the patent application.

Pursuant to section 152, the AEC thereafter directed the Commissioner of Patents to issue a patent on the invention to it as the agent of the United States of America; applicants then requested a hearing before the Board of Patent Interferences, which docketed the proceeding, Case No. 245/71, on May 20, 1971.

On May 28, 1971, applicants filed with the board a motion for summary judgment, supported by argument, reciting the following (emphasis supplied):

This proceeding has been instituted under Section 152 of the Atomic Energy Act of 1954 (42 U.S.C. 2182) to determine whether the Atomic Energy Commission is entitled to the title to the Piper at [sic] al application involved in this proceeding and to the patent which will issue thereon. It is believed that there is no question as to the facts involved in this proceeding and that *the sole issue involved relates to statutory interpretation.*

\* \* \* \* \* \*

It is believed that a proper interpretation of the language used in Section 152 of the Atomic Energy Act of 1952 [sic, 1954] (42 U.S.C. 2182) will be dispositive of this proceeding.

Section 152 of the Atomic Energy Act of 1954 applies only to an "invention or discovery, useful in the production or utilization of special nuclear material or atomic energy." Therefore, if the invention disclosed in the Piper et al application is not "useful in the production or utilization of special nuclear material or atomic energy," then the Atomic Energy Commission has no rights in the application.

\* \* \* \* \* \*

For the foregoing reasons, it is respectfully submitted that there is no genuine issue in this proceeding as to any material fact and that upon the facts before the Board of Patent Interferences, a summary judgment

should be granted as a matter of law in favor of petitioners, James R. Piper et al.

The AEC filed an opposition to this motion and itself moved for summary judgment. Both its motion and its opposition were predicated, inter alia, on the proposition that the applicants' compounds *are* "useful in the production or utilization of special nuclear material or atomic energy," within the meaning of section 152. Thus the issue was joined on the single question of statutory construction.

### The Board Decision

The board's statements and holdings of significance to this appeal were as follows:

The parties having raised no issue of fact, these motions, plus other papers relating to the matter, raise before us a single dispositive issue as to which oral arguments were presented on behalf of both parties at a hearing on September 16, 1971.

The issue is whether the new compounds (antiradiation drugs) claimed in this application are or are not useful in the production or utilization of special nuclear material or atomic energy, within the purview of the Atomic Energy Act of 1954.

\* \* \* \* \* \*

. . . Whether the contract was for the benefit of the Atomic Energy Commission is not an issue here.

\* \* \* \* \* \*

It is apparent in view of the arguments presented by the parties that the breadth of the language of 42 USC 2182 under consideration is anything but clearly delimited. . . .

\* \* \* \* \* \*

. . . [W]e hold that under the facts of this case, where the efficacy of the drugs is so proximately related to the actual production or utilization of special nuclear material or atomic energy as a protective agent for those involved in such activity, . . . the invention is useful in the produc-

tion or utilization of special nuclear material or atomic energy within the purview of 42 USC 2182. Therefore, petitioners' motion for summary judgment is denied and respondent's motion for summary judgment is granted.

Accordingly, we hold in this case the Atomic Energy Commission is entitled to the direction [to the Commissioner of Patents to issue the patent to it] here in issue.

### Opinion

The words in section 152 of the Act, "useful in the production or utilization of special nuclear material or atomic energy," are by no means clear. Obviously, they could be so broadly construed as to include inventions relating to nuts and bolts on *general purpose* machinery used in the production of atomic energy —an absurd result which is not to be attributed to the Congress. See United States v. American Trucking Associations, Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); United States v. Ryan, 284 U.S. 167, 175, 52 S. Ct. 65, 76 L.Ed. 224 (1931). They could be interpreted to encompass inventions which, like that of appellants, appear to have a use predominantly in the nongovernmental sector.[1] And they could be interpreted to exclude such inventions. As the board well said, the breadth of the statutory language "is anything but clearly delimited."

 A statute must be construed to achieve its clear objective, and if two constructions are possible, one achieving and the other defeating that objective, the former prevails. See Shapiro v. United States, 335 U.S. 1, 31, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948). The objec-

tive of the Atomic Energy Act of 1954 was recommended by the President in his message to the Congress on February 17, 1954,[2] as follows:

5. *Liberalize* the patent provisions of the Atomic Energy Act, principally by expanding the area in which *private* patents can be obtained to include the production as well as utilization of fissionable material . . .. [Emphasis supplied.]

That Congress adopted this recommendation is shown by the statement in the reports of both the Senate and House of Representatives that:

It [The Atomic Energy Act of 1954] accomplishes the purposes, set forth in the President's February 17 message to the Congress.[3]

The board's approach, giving "useful in" a broad meaning in favor of the government, would narrow rather than expand the area in which private patents can be obtained—contrary to the objective of the Act. In contrast, that objective is achieved by giving "useful in" a narrower meaning to expand the area for private patents to include appellants' invention.

Our conclusion is reinforced by the apparent lack of an essential or fundamental relationship which appellants' invention bears to the production or utilization of special nuclear material or atomic energy. Nowhere in appellants' application is there any suggestion that the compounds, per se, are essential or fundamental to such production or utilization. At most, the application merely states that:

Antiradiation agents *may* also *be useful* in providing protection against other sources of harmful radiation such as may be encountered by person-

---

1. At oral hearing, counsel for appellee suggested, as "the most vivid example," the use of appellants' invention for personnel in areas around nuclear power generating plants.

2. H.R.Doc.No.328, 83d Cong., 2d Sess. 7 (1954).

3. S.Rep.1699, 83d Cong., 2d Sess. 6 (1954); H.R.Rep.2181, 83rd Cong., 2d Sess. 6

(1954). It is to be noted that the statement refers to the Act as a whole—not to any particular section or sections, and nowhere in the committee reports is there to be found any statement indicating that "liberalization" was confined to any particular section or sections.

nel in the fringe areas of a nuclear explosion or by space travelers. [Emphasis supplied.]

Indeed, counsel for appellee candidly admitted during oral argument that production of atomic energy is exactly the same, whether people in the area have the compound in them or not. And appellee's brief states:

> Thus, if the invention of this application will provide protection against the harmful effects of radiation as the application states, . . . personnel engaged in the acts of making, refining or separating plutonium *could* use this drug as a radioprotective agent against the harmful effects of the radiation from the plutonium. It *might conceivably be used* in lieu of, or supplemental to, radiation shielding in carrying out these acts of plutonium production. [Emphasis supplied.]

Section 153 of the Act (42 U.S.C. § 2183)[4] relating to "nonmilitary utilization" and compulsory licensing, effectively limits the "public interest" in patents, issued pursuant to section 152, to inventions or discoveries of *primary importance* in the production or utilization of special nuclear material or atomic energy,[5] thus:

> (a) The Commission may, after giving the patent owner an opportunity for a hearing, declare any patent to be affected with the public interest if (1) the invention or discovery covered by the patent is *of primary importance in the production or utilization of special nuclear material or atomic energy*; and (2) the licensing of such invention or discovery under this section is of primary importance to effectuate the policies and purposes of this chapter. [Emphasis supplied.]

\* \* \* \* \* \*

Similarly, section 158 (42 U.S.C. § 2188), another "public interest" section, limits special relief in antitrust law violations to patents or discoveries "of primary use" in the utilization or production of special nuclear material or atomic energy. See Helvering v. N. Y. Trust Co., 292 U.S. 455, 464–465, 54 S.Ct. 806, 78 L.Ed. 1361 (1934).

The board held that appellants' invention is "useful in the production or utilization of special nuclear material or atomic energy," because it is "proximately related" thereto as a protective agent for personnel engaged in such activities. However, we can find no basis in the legislative history or in the statute itself for such an interpretation, and no presumption of correctness attaches to such interpretation. See Fitch v. Atomic Energy Commission, 491 F.2d 1392 (Cust. & Pat.App.1974).

Appellee argues that the board was correct in holding that there is nothing in the statute that limits its application to inventions which are *solely* useful in the production or utilization of special nuclear material or atomic energy, and we would agree. It then cites the board's reference to the authority vested in the Atomic Energy Commission by section 31 (42 U.S.C. § 2051) to conduct research and development activities relating to the protection of health and the promotion of safety during research and production activities; also the board's conclusion that inventions or discoveries falling within the areas of health and safety would fall within the authorized activities of the Commission

---

4. Sections 151 through 160 comprise Subchapter XII, "PATENTS AND INVENTIONS," of the Act.

5. It is noted that section 11(c) of the 1946 Act, the predecessor to section 153(a), provided: "(1) It shall be the duty of the Commission to declare any patent to be affected with the public interest if (A) the invention or discovery covered by the patent utilizes or is *essential* in the utilization of fissionable material or atomic energy; . . .." (Emphasis supplied.) The 1954 Act replaced "essential" with the words "of primary importance." See Consolidated Engineering Corp. v. United States, 127 F.Supp. 558, 130 Ct.Cl. 504 (1955), cert. den., 349 U.S. 939, 75 S.Ct. 783, 99 L.Ed. 1267 (1955).

and thus were intended to be covered by section 152 as well.

The fatal defect in this conclusion is that the 1954 Act struck out section 11(b) of the 1946 Act, which provided:

> No patent hereafter granted shall confer any rights with respect to any invention or discovery to the extent that such invention or discovery is used in the conduct of research or development activities in the fields specified in section 3. . . .

Section 3 of the 1946 Act was the predecessor of section 31 of the 1954 Act. No replacement provision for section 11(b) was included in the 1954 Act to exclude the private sector from patents involving research and development in the protection of health and the promotion of safety during research and production activities.

█ In view of the foregoing, we hold that appellants' invention is not "useful in the production or utilization of special nuclear material or atomic energy," within the meaning of section 152 of the Atomic Energy Act of 1954.

The decision of the board is reversed.

Reversed.

MARKEY, Chief Judge (concurring).

Because I do not regard the contractor-developed invention before us as falling under § 152 of the statute, I concur in the result [1] reached by the majority.

Vesting in the AEC of title [2] to the patent in this case, in my view, is not mandated by the statute.

Because we are presented with a contractor-developed invention and a statutory provision, § 152, concerned with the right of the AEC to take title to patents on certain of such inventions, I would begin with at least the premise that the AEC may have such right in this case. The case is here because the invention before us has a use not totally oblivious to the existence of nuclear material or atomic energy. The burden of persuasion that the board erred rests upon appellant, the decision below being entitled as always to great weight. Nonetheless, the appeal is from a summary judgment and the sole question before us, i. e. whether *this* invention is within or without the statute, is one of law. That question turns on the relationship of the invention to the "production or utilization * * * atomic energy." Each invention, and its use, must be independently analyzed, requiring that each case involving that phrase in § 152, of which this is the first, be determined on its own facts. The establishment of guidelines, or pigeon-holes into which future inventions may fall, must await delineation in future cases.

In the present case, I am convinced that the board erred in interpreting the statutory phrase "useful in" as though it read "useful in proximate relation to."

---

[1]. I disagree with major portions of the approaches to statutory interpretation in the majority and dissenting opinions. The result reached by the majority accords with Congress' overall liberalizing intent. I find no compelling evidence that Congress had an opposite intent when it came to § 152. Congress could hardly make "more strict" what had not previously existed. Contrast, the liberal provision, in § 152 as originally enacted, for waiver of title by the AEC to patents on inventions unquestionably within § 152. The 1961 amendment of § 152 totally deleted all inventions made by those engaged in "other relationships" with the AEC. H. R.Res.8599, 87th Cong., 1st Sess., 107 Cong.Res. 16953 (1961).

We should not interpret a new provision, enacted with and as part of a new, liberalizing Act, in such manner as to achieve the intent of the old Act. Certainly we should not do so without strong guidance in that direction from the Congress.

Moreover, I find no valid distinction, in this context, between the opportunity to "get" patents and the opportunity to "get title" to patents, or between government employees and government contractors.

[2]. Only title is at issue. The AEC's existing royalty-free license to make, have made, and use the invention for all governmental purposes is not material to the question before us. Whether the AEC should or should not control the use of the invention for non-governmental purposes, in private hospitals, clinics, X-ray laboratories, and power plants, is equally irrelevant.

The board's sole duty in this case, and ours, is to determine a single issue, i. e. to decide whether the statutory phrase "useful in the production or utilization of special nuclear material or atomic energy" is of sufficient breadth to encompass the particular chemical compounds before us. In accomplishing that duty, it would appear unnecessary, and unwise, to substitute a new phrase for that employed in the statute by the Congress. Mindful of the dangers attending the exercise of such judicial powers, I find in the present case no requirement therefor. Neither the fact that we approach our duty in a precedential void, nor the fact that we are presented by the parties with conflicting interpretations, would justify the approach undertaken by the board in this case.[3]

Moreover, I regard the new language substituted by the board as productive of less certainty, not more, in the future application of § 152. Future cases, as indicated above, will involve different inventions, the nature of which is necessarily unpredictable. It would be at least as difficult, if not more difficult, to apply to such future inventions the phrase "useful in *proximate* relation to" as it is to apply "useful in" to the invention now before us. In such future cases we would then be interpreting our own word, "proximate," rather than the statute itself. Hence, I would limit our decision to the facts before us.

In all events, I believe a consideration of the facts of the case provides sufficient basis for our decision. The primary fact is the invention itself. The surrounding facts are those related to the environment in which the invention is used.

### The Invention

The invention relates only to *chemical compounds*. The claims are totally devoid of any reference whatever to any use. No relationship appears in any claim to the "production or utilization of special nuclear material or atomic energy." No claim refers in any manner to "radiation."

Of course the chemical compound must have utility. Though tested only on mice, we must assume, for the purposes of this case, that the compound is useful in protecting humans against the effects of radiation.

Although the parties employ the handy label "antiradiation drug," the invention does not prevent the occurrence of radiation. It neither produces nor uses radiation. It has nothing whatever to do with radiation *per se*. The invention necessarily works only on the effects of radiation, which effects can occur only in or upon a living organism. The invention necessarily works the same, regardless of the source of radiation, the "production or utilization of special nuclear material or atomic energy" being only one such source.

### Environment of Use

Thus, as above indicated, the use of the invention occurs at a special place. The invention is useful "in" the bodies of mice or men. It is useful "in" nothing else.

The use of the invention also occurs at a different time. Clearly, the invention before us, by its very definition, has no use at all until after special nuclear material or atomic energy has been produced and utilized. Regardless of when they may be injected or ingested, and regardless of how they work, internally or externally of the body, the compounds of the invention cannot perform their intended protective function until after radiation occurs and reaches or approaches the body to be protected. Then, and only then, can the compounds act to blunt or assumedly defeat, the ef-

---

3. For example, having rejected the addition of a certain modifier ("directly") on the "ground" that Congress could have inserted that modifier if it had wanted to, a view applicable to any interpretation, the board then proceeded to insert its own modifier ("proximate relation to") after "useful in" in the statute. Obviously Congress could have inserted "proximate relation to" if it had "wanted to." It didn't.

fects of radiation in or upon the body. That the body may be bombarded by a continuing series of gamma rays does not conflict with the fact that the invention can act against the effects of each ray only after that ray is generated. Until there is radiation there is nothing to be protected against. If the compounds did not require the presence of radiation (from some source) for their utility, the case would not have arisen. In sum, use of the compounds requires the presence of radiation, not the other way round.

The use of this particular invention, against the effects (on humans) of radiation is simply too remote, in my view, to bring the invention within the purview of § 152.

#### "Production and Utilization"

The statute speaks of "production or utilization." The actual production and utilization of special nuclear material or atomic energy are totally unaffected by the invention. As agreed at oral argument, special nuclear material and atomic energy are producible and utilizible in exactly the same way, for the same purposes, and with the same devices, as they have been for years, whether the invention is present or not.

"Production" and "utilization" are action words.[4] The present invention takes no part whatever in the *act* of producing or in the *act* of utilizing special nuclear material or atomic energy. The invention is totally passive in relation to such production or utilization. It never "gets into the act." It is just *there*, in the bodies of mice or men. A contractor-developed invention which has no effect whatever on "production or utilization or special nuclear material or atomic energy" cannot be said to be useful *in* such production or utilization, so as to require the AEC to take title to the patent thereon under § 152.

The only things anyone can do with atomic energy are to produce it and use it. It is clear that the Congress was and remains concerned with the producing of atomic energy and the using of it. Hence its language "useful in the production or utilization * * * ." The chemical compounds before us neither produce nor utilize special nuclear material or atomic energy. Title to a patent thereon may therefore be safely left in the hands of appellant in full compliance with the overall intent of Congress to encourage private industry. For the AEC to take title to this particular invention is contrary to that intent. At the same time, such taking would do nothing to further Congress' concern for control over production and use of atomic energy.

#### The "Absence of the Invention" Argument

All of appellee's arguments resolve into a single hypothetical. Fairly summarized, the argument runs, "In the absence of the invention, there may be some situations in which special nuclear material or atomic energy could not be produced or utilized by unprotected workers." No evidence of any such situation is of record. From that sole hypothetical, counsel urges the conclusion that the invention must be "useful in" such production or utilization.[5]

The difficulty with employing a hypothetical absence of the invention (rather than what it is and what it does to what) as the sole decision making device lies in its breadth of application. It is difficult, if not impossible, to conceive of an invention which might escape the designation of "useful in the production or utilization of special nuclear material or atomic energy" if one need only imagine circumstances under which such production or utilization would be impeded by the absence of the invention from those circumstances.

---

4. Webster's Seventh New Collegiate Dictionary, 1971 Edition.

5. Counsel for appellee admitted at oral argument, however, that *these very compounds,* in the bodies of mice, would *not* be useful in such production or utilization.

The most that can be said for appellee's hypothesis is that use of these chemical compounds might, under some circumstances, be *ancillary* to the production or utilization of special nuclear material or atomic energy. The difficulty is that that is not what the statute says.

Similarly, certain items within the hypothesis are clearly exempt. Appellee's counsel admitted, with admirable candor at oral argument, that a tranquilizer invention in the bodies of nervous workers, though it enabled use of atomic enegy where *it couldn't otherwise be used,* would *not* be "useful in" such production or utilization under the statute.

It is clear, nonetheless, that appellee's hypothesis formed the fundamental basis for the board's decision, which was that the "efficacy of the drugs is so proximately related to the actual production or utilization of special nuclear material or atomic energy as a protective agent for those involved in such activity" as to bring the invention under § 152. But that holding redrafts the statute to add "proximate relation to" after "useful in." As indicated above, I find no warrant for such redrafting.

Contrary to the board's statement, the "efficacy" of the compounds is necessarily upon or within the person whose body contains them, not on the "actual production" of atomic energy. As appellee admits, the compounds themselves have no efficacy whatever vis-a-vis the actual production or utilization of special nuclear material or atomic energy. Only the imagined circumstances of appellee's argument, hypothesizing some production or utilization circumstances occurring in the absence of the invention, could have led the board to the view that the compounds somehow had an efficacy related, even proximately, to "actual production" of atomic energy.

The board supplies no compelling reason for interpreting "useful in the production or utilization of special nuclear material or atomic energy" as encompassing inventions only "proximately"

related to such production or utilization. For the reasons stated, I regard the invention as "related" only to the effects of radiation on the bodies of mice or men, which effects occur after such production or utilization. But even if the board's "proximately related" characterization, based on counsel's hypothetical, be given full credence, I find erroneous the notion that the present chemical compounds, the use of which is only "proximately" related to production or utilization of atomic energy, are also used sufficiently "in" such production or utilization as to bring them within the statute.

The future may well disclose a class of inventions which are not directly employed in the actual production or utilization of special nuclear material or atomic energy but which are so closely related to, or so directly affect, such production or utilization as to fall within the provisions of § 152. In my view, the chemical compounds before us are not of that class.

Hence I would find that chemical compounds which are used only in the bodies of persons exposed to radiation, and only to counteract or preclude the effects of such radiation, are not so "useful in the production or utilization of special nuclear material or atomic energy" as to bring such compounds within the purview of § 152. Accordingly, and on that basis, I would reverse the decision of the board.

RICH, Judge (dissenting).

I respectfully dissent because I believe that the language of the applicable statute encompasses this invention.

*Section 151 and Congressional Intent*

The majority quotes from the President's message to Congress and the House and Senate Reports. I agree with the reports that the AEC Act accomplishes the purpose set forth in the President's message. That purpose was accomplished, however, not by § 152, but by the changes Congress made in § 11 of the 1946 Act by enacting § 151 of the

1954 Act. Section 152 was an *entirely new* section which deals with something entirely different from the "area in which private patents can be obtained," of which the President spoke. If there is in the statute an intent to "liberalize," the question to ask is "liberalize what?" I answer by saying "to liberalize § 11" by enacting § 151, and I will now show why.

The majority, like appellants, confuses the sections of the patent provisions of the 1954 Act which deal, first, with the *rights of all inventors, whether they are employed by the Government or anyone else, to get private patents* in the field of atomic energy, which was the subject of § 11 of the 1946 Act and is the subject of § 151 of the 1954 Act, and, second, with the *disposition of title to inventions made under contracts with the AEC*, the subject of § 152 and § 159 (42 U.S.C. § 2189) of the 1954 Act, which have no counterparts in the 1946 Act. The former is what Congress liberalized; the latter was made, if anything, more strict by the 1954 Act.

As the majority notes, the President called upon Congress to

> Liberalize the patent provisions of the Atomic Energy Act, *principally by expanding the area in which private patents can be obtained to include the production as well as utilization of fissionable material* * * *. [Additional emphasis added.]

Congress responded by deleting § 11(b) in the 1946 Act and replacing § 11(a)(1) and (2) with new sections 151(a) and (b) where, among other things, the recitation of "production of fissionable material" was *dropped* in order that, under the revised section, private patents could be granted and confer rights in inventions useful in the production of fissionable material. If § 152 is to be considered in the same light as § 151, it would indeed be strange that Congress put into § 152 essentially the same wording, "production of special nuclear material," which it deleted from § 151 to liberalize the patent provisions

according to the President's request. The answer, of course, is that Congress did not take away in § 152 that which it gave in revised § 151 because the two sections relate to different matters. Section 151 deals with the fields in which the Patent Office may *grant* patents, or in which the patents granted confer rights (i. e., the area in which private patents can be obtained), while § 152, as shown by its title, deals only with the *disposition of title* to patents where the invention is made or conceived while the inventor is *under a contract with or for the benefit of the AEC*. Accordingly, the legislative history supporting liberalization of the patent provisions does not apply to § 152, and thus the majority is in error in saying that the board's, or this court's, construction of the language of § 152 has anything to do with expanding "the area in which private patents can be obtained —[and is therefore] contrary to the objective of the Act."

### Substitution of Language

The concurring opinion chides the board and the dissent for indulging in the substitution of its own language for that of the statute. I do not believe that the board's use of the term "proximately related to," in the portion of the board's opinion quoted by the majority, is properly characterized as a substitution of the language "useful in proximate relation to" for the "useful in" of the statute. I believe the board was properly characterizing what it believed was the *relationship of this invention to* the production or utilization of special nuclear material or atomic energy, and the board was no more engaging in the substitution of language than does the concurring opinion when it makes the following four statements:

> The use of this particular invention, against the effects (on humans) of radiation is simply too remote, in my view, to bring the invention within the purview of § 152.

> * * * * * *

A contractor-developed invention which has no effect whatever on "production or utilization of special nuclear material or atomic energy" cannot be said to be useful in such production or utilization * * *.

* * * The chemical compounds before us neither produce nor utilize special nuclear material or atomic energy.

* * * * * *

The future may well disclose a class of inventions which are not directly employed in the actual production or utilization of special nuclear material or atomic energy but which are so closely related to, or so directly affect, such production or utilization as to fall within the provisions of § 152.

* * * * * *

If the board's statement is to be looked upon as a substitution of language, then a much more serious substitution of language occurs, I believe, in the statement of the majority that notes "the apparent lack of an *essential or fundamental relationship* which appellants' invention bears to the production or utilization of special nuclear material or atomic energy." (Emphasis mine.) I ask what is an "essential or fundamental relationship" to atomic energy, and how is it to be determined? It seems to me that if Congress wanted the Commissioner to issue patents on contractor-made inventions to the AEC which bore an "essential or fundamental relationship" to atomic energy, it would have said so, and would probably have used words very much like those it did use in *other* sections of the Act,[1] namely, § 153 and § 158.

If § 152 is to be interpreted as requiring "an essential or fundamental relationship * * * to the production or utilization of special nuclear material or atomic energy," where Congress stated that the invention need only be "useful in" such production or utilization, then must not other provisions of the Act

containing the same language be given the same restrictive meaning? The same phrase, "invention . . . useful in the production or utilization of special nuclear material or atomic energy," appears throughout the patent provisions of the Act. Some of these sections, like § 157(b)(3), benefit the public. Does not the holding of the majority mean that one making an invention which lacks "an essential or fundamental relationship" to atomic energy, etc., *cannot now get an award* under the above section? Similarly, does not the majority's reliance on the assumed fact that "production of atomic energy is exactly the same" whether the invention is used or not to show that the invention has no "fundamental or essential relationship" mean that the AEC can now deny claims for awards under § 157 for such things as the shielding mentioned by the majority's quotation from the AEC's brief because plutonium can be produced without it? This seems to be a short-sighted approach to statutory language which only requires the invention to be "useful in" atomic energy, etc.

### Section 31 of the Act

The majority's reliance upon section 31, and its predecessor, section 3, seems misplaced. The majority treats its discovery that § 11(b) was amended in 1954 to remove a reference to § 3 as an easy answer to "the board's conclusion that inventions or discoveries falling within the areas of health and safety would fall within the authorized activities of the Commission and thus were *intended to be covered by section 152 as well*." (Emphasis mine.) In fact, the board's reference to § 31 was not to show that § 152 would cover health and safety inventions, but only to show that present § 31 would give the AEC the right to contract for such health and safety inventions and thus, in the words of the board, the AEC "in issuing the

---

1. See footnote 5 of the majority opinion which notes that Congress replaced the very word "essential" with the words "of primary importance in" in the 1954 Act in another section of the Act.

direction under consideration here * * * did not reach beyond the limits of what it was in fact authorized and directed to do by direct arrangement with such a contractor." [2] The reference to § 3 in the 1946 Act, which was omitted in 1954, was *in section 11(b)*, as noted by the majority, and, as previously noted, like section 11's replacement, section 151, it deals only with the right of inventors to get patents and not the disposition of title to inventions made under AEC contracts.

### Other Sections of the Act

The majority considers the language of § 153 and § 158 to control in some way the meaning of § 152. It is not clear to me how the *different* words Congress used in these sections has any bearing on the meaning of the words in the section which we must here construe. There is no basis for the majority's statement that § 153 "effectively limits the 'public interest' in patents, issued pursuant to section 152 * * *." Section 153 has no connection at all with § 152; it is only a provision for compulsory licensing of patents and gives the AEC the right to declare a patent "to be affected with the public interest." The patents are not "pursuant to section 152." As noted earlier, § 152 is not a patent-granting or patent-issuing statute; it deals only with the disposition of rights in inventions made in the course of or under AEC contracts. Reliance upon the language of § 153 here shows again that the majority has not appreciated the fact that § 152 has nothing whatsoever to do with the *issuance* of patents. I fail to see how the use by Congress of different language in § 153, and § 158, has a bearing on the meaning of § 152. If anything, the fact that Congress chose to use *different* language in these sections suggests that Congress meant the sections to have *different* meanings.

### The Concurring Opinion

The concurring opinion, under the heading "Environment of Use," states that:

> Clearly, the invention before us, by its very definition, has no use at all until after special nuclear material or atomic energy has been produced and utilized. Regardless of when they may be injected or ingested, and regardless of how they work, internally or externally of the body, the compounds of the invention cannot perform their intended protective function until after radiation occurs and reaches or approaches the body to be protected.

I know of no support in the record for the proposition that "the invention before us, by its very definition, has no use at all until after special nuclear material or atomic energy has been produced and utilized." Lethal radiation is not only released after special nuclear material and atomic energy are produced and utilized, but *during* the production and utilization process as well. For example, in the process of producing the "special nuclear material," plutonium, radiation is emitted during the production process as well as from the final product. Even, however, if the statement of the concurring opinion were true, utility *after* production or utilization would not mean a lack of utility *in* production and utilization, which is all the statute requires.

Secondly, I fail to see the relationship *to utility* ("useful in") of the admitted fact that "the compounds of the invention cannot perform their intended protective function until after radiation occurs and reaches or approaches the body to be protected." Raincoats and umbrellas cannot perform their intended protective function until after rain occurs and reaches or approaches the body of the user either, but this does not make them any less *useful in* fulfilling

**2.** This is really a minor argument of the board, anyway, compared with the many pages the board spent construing the meaning of the terms of the statute it had to interpret.

that function. As noted in the portion of the AEC brief quoted by the majority, the compounds of the invention are considered to be an alternative to, or supplement to, radiation shielding. The parties have not controverted the utility of conventional shielding in the production or utilization of special nuclear material or atomic energy, but the test established by the concurring opinion would read conventional shielding out of the statute as well.

The second reason why the concurring opinion finds the invention to be without the statutory language is that "special nuclear material and atomic energy are producible and utilizable in exactly the same way, for the same purposes, and with the same devices, * * *, whether the invention is present or not." If the concurring opinion means by this statement and by the assertion that the "invention is totally passive * * * [and] never 'gets into the act' " that the invention serves only *as an emergency backup safety system*, then such a rationale would read out of the statute all such backup system inventions. If what the statement means is that regardless of the presence of the drugs in an operator or another who is near a reactor or plutonium production apparatus which is *releasing radiation at lethal levels*, the reactor or apparatus will function just the same, then the concurring opinion takes a myopic view of utility. A requirement that in order to be *"useful"* an invention affect the production or utilization so as to modify it seems to me to be asking for the very standard which the concurring opinion vehemently rejects, the "absence of the invention" test. If one must ask whether "special nuclear material and atomic energy are producible and utilizable in exactly the same way, for the same purposes, and with the same devices * * *, whether the invention is present or not," is not

this a requirement that the AEC prove that in the "absence of the invention," the utilization and production "in exactly the same way * * * with the same devices" would not be possible? Further, such a requirement would mean that such things as a reactor containment vessel and all of its concomitant radiation shielding apparatus would also not be "useful in" atomic energy, etc., because the reactor would run the same way without such shielding. To require that the production or utilization of atomic energy or special nuclear material somehow be affected by the presence of the invention appears, therefore, to be a much too stringent requirement where the language used by Congress only requires that the invention be "useful." [3]

Finally, it is the view of the concurring opinion that "All of appellee's arguments resolve into" the single argument that "In the absence of the invention, there may be some situations in which special nuclear material or atomic energy could not be produced or utilized by unprotected workers." I cannot agree that this is a correct summary of appellee's arguments, which deal primarily with the meaning of the words of the statute. In fact, I have studied in detail all of the briefs of appellee before the board and this court, and the only evidence of such an argument appears in the single statement appellee's counsel made in response to a question from the bench at oral argument, which statement is as follows:

In the case of a nuclear reactor or in the case of a laboratory where gamma radiation is produced and utilized, the persons in the area could be injected before they begin the reactions which produce the gamma radiation, and if they were very effective, perhaps certain reactions which take place would

---

3. If such is the test to be applied, however, then the example given by counsel for appellee, discussed shortly, would suggest that the invention here fulfills it.

be rendered possible, whereas in the absence of radio-protective drugs it would be impossible to run the experiments. In any event, if the drugs have the utility that the application alleges they do, there is still the foreseeable use of injecting, for example, an operator around a nuclear reactor who is apt to be exposed to gamma radiation from the reaction, and thereby he could conduct certain work in that area which in the absence of the drugs he could not conduct.

In my view, the AEC did not ask that the case be decided on the basis of the "absence of the invention" argument but only on the wording of the statute. Further I do not find in the opinion of the board reliance upon an "absence of the invention" test as a standard for determining whether an invention is "useful."

I do not know the mental processes of the board any better than the author of the concurring opinion, but I do not find in the language of the board any basis for the statement of the concurring opinion; and it is improper, in my view, to attribute such a hypothetical foundation to the language of the board. I read the statement of the board which uses the word "proximately" as an effort by the board to note the proximity, or closeness, of this invention to atomic energy, etc., and to distinguish such inventions as the "tranquilizer" discussed

by the concurring opinion. What the board was saying, I believe, was only that the compounds of the invention work against the very effect of atomic energy and special nuclear material production and utilization, radiation, while other inventions, such as tranquilizers, would not be so closely, or proximately, related to such production or utilization.

### My Decisional Basis

I would affirm the decision of the board. I am satisfied that there is a logical answer to each and every one of appellants' arguments and I find that the ordinary meaning of the statutory phrase "useful in the production or utilization of special nuclear material or atomic energy" encompasses this invention.

While the breadth of the language of the statute is, as noted by the board, "anything but clearly delimited," I would limit our decision to the facts of this case [4] and hold, as did the board, that "the efficacy of the drugs is so proximately related to the actual production or utilization of special nuclear material or atomic energy as a protective agent for those involved in such activity" that it is within the purview of § 152. In the posture in which this case comes before us it must be assumed that the invention will protect people, as well as mice, from the effects of gamma rays which are given off "in the production

---

4. I do not believe that we should pre-decide that "inventions relating to nuts and bolts on *general purpose* machinery used in the production of atomic energy" are not within the statutory language. This is not the case before the court, and such statements will only make it more difficult for the court to decide other cases in the future, which may involve general purpose machinery.

The statement of the majority opinion also suggests that the invention "[has] a use predominantly in the nongovernmental sector." I do not find this supported by the record; and nothing is gained by speaking not of use in atomic energy, but predominant use in the nongovernmental sector.

The implication of footnote 1 in the majority opinion is that the AEC counsel was giving a "vivid example" of use of the invention in the nongovernmental sector, when, in fact, I believe he was speaking only generally of the use of the invention "in the area around a nuclear reaction, nuclear reactor, say for the production of electrical energy," and said nothing about whether nuclear reactors are governmental or nongovernmental. Section 2 of the Act (42 U.S.C. § 2012) even seems to show a Congressional finding that the use of atomic energy and special nuclear material is, at least to some extent, a governmental function.

* * * of [the] special nuclear material," plutonium, and is thus "useful in" the production of such material.

I am convinced that if Congress had not intended such a construction of its language, it would have used more limited phrases or limiting modifiers such as the majority now substitutes and such as Congress used in many other sections of the Act.[5] Congress not having done so, however, I conclude that Congress must have intended the broader scope of the broader language it used. Accordingly, on the required assumption that the invention would save human lives, as it did the lives of the mice, I find the invention to be "useful in the production or utilization of special nuclear material or atomic energy" and would affirm the decision of the board.

5. For example, as has been shown, when Congress wanted to use the phrase "of primary use in" in § 153, it did so. Congress also used this more limiting language in § 158 (42 U.S.C. § 2188).