**U. S. DEPARTMENT OF ENERGY, Appellant,**

**v.**

**Ralph E. WHITE, Appellee.**

**Ralph E. WHITE, Cross-Appellant,**

**v.**

**U. S. DEPARTMENT OF ENERGY, Cross-Appellee.**

**Appeal Nos. 80–525, 80–524.**

United States Court of Customs and Patent Appeals.

June 30, 1981.

William E. Thomson, Jr. and James E. Eakin, Los Angeles, Cal., for appellee and cross-appellant.

Jack Q. Lever, Jr., R. V. Lupo, Deputy Asst. Generals, Washington, D. C., and John Koch, Chief, for appellant and cross-appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

RICH, Judge.

These cross-appeals are from the decision of the United States Patent and Trademark Office (PTO) Board of Patent Interferences (board) in a "direction" proceeding under § 152 of the Atomic Energy Act of 1954 (Act), 42 U.S.C. § 2182 (hereinafter § 152),[1] which granted the motion for judgment of Ralph E. White (White) and refused a di-

---

1. Section 152, in pertinent part, reads:

*Inventions conceived during Commission contracts; ownership; waiver; hearings.*

Any invention or discovery, useful in the production or utilization of special nuclear material or atomic energy, made or conceived in the course of or under any contract, subcontract, or arrangement entered into with or for the benefit of the Commission, regardless of whether the contract, subcontract, or arrangement involved the expenditure of funds by the Commission, shall be vested in, and be the property of, the Commission, except that the Commission may waive its claim to any such invention or discovery under such circumstances as the Commission may deem appropriate, consistent with the policy of this section.

rection for the United States Department of Energy (DOE) that the patent on White's application issue to it.[2] The patent application involved is serial No. 59,795, filed by White on June 3, 1970, for "Means and Techniques Useful in Controlling Nuclear Detectors." We reverse and remand.

## The Invention

The eight allowed claims in the White application are directed to an improved nuclear radiation detector. In the past, ion-chamber detectors were used at the government's Nevada test site and elsewhere for measuring the levels of ion radiation fluxes, commonly referred to as background radiation. Unfortunately, successful underground nuclear explosions, as well as lightning, generate large electromagnetic pulses (EMPs) which paralyze ion-chamber detectors.

White has allegedly circumvented such EMP paralysis by incorporating a means for automatic self-neutralization. Like its predecessors, the detector comprises an ion chamber and an output circuit which includes an electrometer tube with a floating-potential grid connected to a collector within the chamber. EMP paralyzed the prior art detectors by depositing a negative charge on the grid which shuts off the tube from any changes within the ion chamber. The neutralizing means in the improved detector, however, conductively connects the control grid of the electrometer tube to the cathode whenever the tube is shut off by EMP. Thus, the floating-potential grid is automatically restored. In operation, the present detector can supposedly be restored within a very short time.

2. The Atomic Energy Commission (AEC) was the initial authority referred to in § 152. Prior to this direction proceeding, the AEC was abolished and replaced by the United States Energy Research and Development Administration (ERDA) which, during the hearing below, became DOE.

3. 37 CFR 1.287, in pertinent part, states (emphasis ours):
§ 1.287 *Discovery.*
(a)(1) Each party who expects to take testimony must serve on each opposing party who requests service the following:

## Matters Appealed

DOE appeals from the grant of a Motion for Judgment for White (Motion VII), the decision of the board being that the White invention was not "useful in the production or utilization of special nuclear material or atomic energy" within the meaning of § 152. White cross-appeals because of the board's rejection of his position that DOE failed to prove any contract for the *benefit* of DOE. White also appeals from the board's decisions which suppressed some of his evidence by which he sought to prove that he invented the subject matter prior to any government involvement. (Motions IV and V.) Since we reverse the board's ruling on the Motion for Judgment by White, the issue raised on White's cross-appeal must be considered.

## Motion IV

The board granted the motion denying White the opportunity to use physical exhibits 2, 2–C, 3, and 4 which had been offered during his rebuttal testimony. White's rebuttal discovery paper, filed under 37 CFR 1.287(a),[3] listed twelve categories of "documents" and one physical exhibit. Document item 2 referred to "documents" listed in an attachment which actually was an index of documents and physical things. Further, White relies on a previous notice in connection with his testimony-in-chief.

The board found that the physical things listed in the index did not fall within the notice requirements of § 1.287(a)(1)(ii).

(i) A copy of each *document* in his possession, custody, or control and upon which he intends to rely,
(ii) A list of and a proffer of reasonable access to *things* in his possession, custody, or control and upon which he intends to rely, and
(iii) A list giving the names and addresses of all *persons* whom he intends to call as witnesses and indicating the relationship of each person to the invention in issue.

More particularly, the board said the listing "does not act to apprise ERDA [DOE] that those four physical 'things' are intended as rebuttal evidence." Furthermore, it was said that no proper rebuttal purpose had been established for the exhibits.

### Motion V

At the beginning of a deposition of White on December 11, 1975, counsel for DOE objected to the taking of the deposition (subsequently sustained) and to the presence of Mr. Perry Landers (Landers), a technician employed by White. Landers had been previously listed by White as a witness for establishing conception and reduction to practice of the invention. Landers was deposed immediately after White. DOE then filed a motion with the board based on Rule 615 of the Federal Rules of Evidence (FRE).[4] The board granted this deferred motion, which was to suppress Landers' testimony at final hearing, because he was present, after objection, at the taking of White's testimony.

The Board of Patent Interferences noted that, unlike courts, it does not have contempt powers to enforce compliance with its evidentiary rulings. Though the board had not formally adopted the FRE, it deemed them to be within the "established rules of evidence" mandated by 37 CFR 1.286,[5] which are to be "applied strictly." The board declared its authority to be limited "to the admittedly harsh remedy of excluding evidence," as set forth in 37 CFR 1.286. In view of the "emphasis historically placed upon independent corroboration," it deemed it "critical to effect the purpose of Federal Rule 615" and granted the motion to exclude the entire Landers testimony and, therefore, gave it no consideration.

4. FRE Rule 615 provides, in pertinent part:
  At the request of a party *the court* shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. [Emphasis ours.]

5. 37 CFR 1.286 reads:
  § 1.286 *Objections to admissibility.*

### Motion VII

White moved for summary judgment on the ground that the present invention was not "useful in the production or utilization of special nuclear material or atomic energy" as required by § 152. Commenting that genuine issues of material fact existed, the board initially treated this motion as one for disposition at final hearing rather than one for summary disposition and deferred its consideration.

At final hearing the board granted White's motion, saying that the mere detection of radiation by an invention without any further functions relating to the production of nuclear energy was too remote for the purposes of § 152. Citing the statutory objectives set forth in *Piper v. AEC*, 502 F.2d 1393, 183 USPQ 235 (Cust.& Pat. App.1974), the board stated that the "useful in" phrase of § 152 must be narrowly construed.

### Contractual Issue

In addition to the motions, the board reviewed the other § 152 issue of whether the present invention was made or conceived by White in the course of, or under a contractual arrangement entered into with or for the benefit of DOE. The board noted that the contract document in evidence purportedly meeting the § 152 contractual arrangement requirement was a purchase order from Reynolds Electrical and Engineering Company (REECO) to White. This contract was identified as Purchase Order D-00856-CA-01 (REECO PO), dated April 4, 1970, under Prime Contract AT(26-1)-410.

The following facts were set forth by the board regarding the REECO PO. Mr. Gripentog, a REECO employee experienced in electronics, first visited White in November,

  Subject to the provisions of § 1.285, objection may be made to receiving in evidence any deposition or part thereof, or any other evidence, for any reason which would require the exclusion of the evidence according to the established rules of evidence, which will be applied strictly by the Office.

1969, and again in January, 1970.[6] During these visits they discussed ion chambers and the EMP problem at the Nevada test site.

On March 4, 1970, Gripentog prepared and issued an invitation to bid or a request for quotation (an RFQ) for an improved ion detector. Both White and another party bid on this RFQ, but the RFQ was soon cancelled because White's bid involved too much money and the other bid was held to be nonresponsive. Sometime between March 16 and April 8, 1970, Gripentog and White negotiated a reduction in price which resulted in the REECO PO. White sent a prototype detector to REECO on June 3, 1970.

On these facts, the board held that DOE had met its burden of proof. The White invention was found to have been conceived "in the course of or under [a] contract, subcontract, or arrangement entered into * * * for the benefit of the Commission" as required by § 152.

Nevertheless, because the board granted White's Motion VII, holding that his invention was not "useful in the production or utilization of special nuclear material or atomic energy," its ultimate decision was in White's favor, under § 152, and a direction to issue the patent to DOE was refused.

These appeals followed.

### DOE's Arguments

DOE first argues that the present invention must be "useful" for the purposes specified in § 152 because it was designed specifically for the government's Nevada test site. The nuclear radiation detector circuit supposedly invented by White was allegedly shown to White by Gripentog when he, not White, conceived it at a meeting with White in November, 1969, in which EMP problems at the test site were discussed. Thus, DOE says the monitoring of nuclear explosions at the test site by this detector

necessarily is "useful in the production or utilization of special nuclear material or atomic energy."

DOE says the board improperly analogized the usefulness of the anti-radiation drug invention in Piper to the present invention. Even though both involved "radiation," DOE states that the board "clearly failed to see the great factual differences between the Piper invention and this invention." The protection afforded one exposed to radiation regardless of source by the Piper anti-radiation pill is alleged to be far afield from a radiation detector designed for operation in an environment of nuclear explosions.

Another error of the board is said to be its interpretation of the holding in Piper. According to DOE, the Piper majority did not hold that inventions subject to direction proceedings must be part of the chain reaction itself. Statements in Piper about the "apparent lack of an essential or fundamental relationship" between the Piper pill and atomic energy production or utilization are declared to be clearly a commentary on the remoteness of the Piper invention (a chemical compound) from the field of atomic energy, not a requirement that all inventions upon which directions under § 152 are filed be causal in the sense of actually being a part of the chain reaction.

Alternatively, DOE argues that if the board did properly construe Piper, that case should be overruled because the Piper court did not possess a complete record of the legislative history of the Act which it has now augmented.[7]

The Piper majority, it is alleged, erred in considering only one of three distinct patent objectives recommended by President Eisenhower to Congress, which were: (1) expansion of the subject matter for which private patents may issue; (2) compulsory licensing of certain atomic energy patents;

6. White's testimony corroborated these visits.

7. DOE refers to the complete compilation as the "Losee Work," named for the librarian who oversaw its publication: Legislative History of the Atomic Energy Act of 1954 (Public Law 703, 83rd Congress), Compiled by Madeleine W. Losee, Law Librarian, U. S. Atomic Energy Commission, Washington, 1955. Relevant portions of the legislative history of §§ 151, 152, and 153 have been excerpted and supplied to the court in an appendix to DOE's main brief.

and (3) a mechanism for preventing government contractors from building a "patent monopoly." *Piper* supposedly failed to address the last two important objectives.

In a lengthy discussion of the legislative history of § 152, DOE argues that "useful in" must be interpreted in the normal, broad sense in order to effectuate the statutory purpose. Section 152 is said to have been incorporated into the Act to implement the third presidential patent objective, supra. Contemporaneous statements by two Congressmen intimately involved in the legislative efforts are said to reveal that the broad, normal meaning of "useful in" was intended by Congress.

## White's Contentions

In his main brief, White alleges that DOE failed to carry its burden of proving either that it owned the property rights to the White detector, or that the utility of the detector made it subject matter within § 152.

Proof of DOE acquiring White's property rights is said to be absent from the record. By failing to introduce any written contract proving the purchase of ownership rights in the White detector by REECO, DOE's case is alleged to lack sufficient evidence of ownership by REECO, much less DOE. The record supposedly is devoid of the prime contract linking DOE to REECO, Prime Contract AT(26–1)–410. Oral testimony of REECO employees regarding this relationship is stated to be equally deficient in that, at best, the EMP detector project apparently originated totally within REECO and, therefore, is not evidence of "the specific contractual relationship required by law to give DOE the right to claim title in Mr. White's invention."

The only contract document of record, the REECO PO, is also said not to adequately prove acquisition of the White patent rights. White points to the inclusion of a patent indemnity clause in the PO to prove that REECO did not intend to obtain patent rights.

White next argues that the detector could not have been conceived under a contract with DOE because it was conceived prior to government involvement. However, to prove not only a prior conception but a prior actual reduction to practice, White seeks to rely on the excluded Landers testimony and the four excluded exhibits.

The board allegedly erred in excluding the Landers testimony by granting Motion V, supra. Federal Rule of Evidence 615 is said to pertain to the exclusion of witnesses, not the admissibility of evidence.

The exclusion of the exhibits by granting Motion IV, supra, is stated to be another error by the board. White argues that its discovery notice is adequate and further cites portions of the record to show that counsel for DOE had already had notice of and in fact inspected the exhibits prior to the abortive White deposition, wherefore counsel could not claim to be either surprised or injured by them.

The second half of White's arguments deals with the issue of statutory interpretation and with *Piper*. White says *Piper* was manifestly correct. DOE's proposed construction is said to be merely a reargument of old issues "contrary to the plain purposes of that legislation."

DOE's argument supposedly relies upon § 151 as the only liberalizing, i. e., expansive, provision of the Act. However, White asks why, if the purposes of § 151 and § 152 were so different, is the language of § 151 substantially duplicated in § 152. Countering DOE's argument, White declares that the board properly analogized the Piper pill and the White detector since both protect one from harmful radiation. White says the Piper pill protected the subject from the harmful effects of radiation and his monitor does likewise by signaling the existence of such radiation.

It is further argued that the novel feature of the present invention, automatic neutralization of EMP effects, has no sole relationship with atomic energy. Therefore, White contends the detector falls outside the ambit of § 152 as defined by the *Piper* majority.

*DOE's Reply*

DOE replies to White's arguments concerning insufficient proof of a contractual arrangement between DOE and REECO, showing that DOE meant to acquire title to the detector from its conception. The record is said to be replete with specific admissions by White, as well as the testimony of others, that he knew REECO had various responsibilities at the test site, e. g., nuclear radiation monitoring, derived from a contractual relationship with DOE. Introduction of the prime contract into evidence is stated to be unnecessary because its contents were proved by admissions of a party.

The conception of the detector prior to the existence of a "contract, subcontract, or arrangement entered into with or for the benefit of the Commission" is also rebutted by DOE. The meetings between White and Gripentog, who initiated those meetings, are said to be where White learned of REECO's desire to solve the EMP problem. After issuance of the RFQ, White is said to have submitted his solution to that problem in a bid for the REECO contract.

The absence of a clause governing the acquisition of patent rights in the REECO PO is said to be irrelevant. Section 152 by itself, it is argued, governs the allocation of patent rights under the present circumstances. An express grant is declared to be unnecessary once a contractual relationship has been established.

Regarding Federal Rule of Evidence 615, DOE maintains that the board merely recognized the importance of having independent corroboration when it refused to consider Landers' testimony. The testimony of a witness exposed to that of another is declared to be presumably tainted, the only remedy for which is its total exclusion.

The ruling of the board with respect to the exclusion of exhibits is also supported by DOE. The reference to "documents" did not apprise DOE that physical "things" were being noticed. Further, an earlier opportunity to inspect the physical exhibits connected with White's case-in-chief is said

not to satisfy the notice requirements of 37 CFR 1.287(a) for a rebuttal case. DOE, it is argued, should have been informed not only of the existence of the exhibits, but also that they were to be relied upon.

*White's Reply*

White says the "best evidence" rule, FRE 1002, requires the introduction into evidence of the prime contract document between DOE and REECO in order to prove its terms, without which a direction proceeding is improper. It is stressed that the REECO PO itself does not establish the necessary contractual link between DOE and White.

The conception date for the detector is also discussed. White's bid in response to the RFQ, Gripentog's testimony, and Landers' testimony are all said to prove conception by White prior to April 8, 1970, the effective date of the REECO PO.[8]

White again discusses the nature of evidentiary Rule 615, saying it provides for a court order in a live courtroom setting. Direction proceedings are said to be of a different and special nature, e. g., the absence of live testimony and an expanded time frame characteristic of a board "trial." Automatic exclusion of testimony in such a proceeding is declared to be too drastic a remedy for the possible degree of taint.

In response to DOE's arguments concerning the exclusion of exhibits, White argues over both the interpretation and nature of the rebuttal discovery document. A person of normal intelligence allegedly would have realized that the item incorporating by reference certain "documents" in an attachment was a misnomer and that it was clearly intended to cover all exhibits rather than papers only. Therefore, White concludes that the spirit of the discovery rule was followed—no surprise was intended or would have been apparent to a reasonable man. Furthermore, all of these exhibits are legitimately related to a rebuttal function. Gripentog's testimony in DOE's case-in-chief is alleged to be directed toward doubts

---

**8.** White maintains that the claimed invention was conceived in July, 1969.

as to who was the real inventor of the detector. Therefore, a showing of prior conception is declared to be available for rebuttal purposes.

## OPINION

To be entitled to the direction, DOE must satisfy three requirements: (1) demonstrate the utility of the subject invention with respect to the "production or utilization of special nuclear material or atomic energy"; (2) prove the invention was "made or conceived in the course of or under [a] contract, subcontract, or arrangement"; and (3) prove that such an arrangement was "entered into with or for the benefit of" DOE.

### The Utility Issue

DOE has requested that in resolving the "useful in" aspect of the title question (Motion VII), which the board decided in favor of White on the basis of this court's holding in *Piper*, supra, we review this court's opinion in *Piper* which was the case of first impression in this court on § 152. In particular, we are asked to look once more at the legislative history of § 152 since, it is alleged, not all relevant historical materials were before the *Piper* court and have only now been presented to us.[9]

The majority in *Piper* stated that the construction of the "useful in" clause of § 152, whether broad as here contended by DOE or narrow as argued here by White, depends upon satisfying President Eisenhower's February 17, 1954, message to Congress.[10] In choosing the narrow construction, the *Piper* majority relied on the fifth amendment recommended in that message[11] which reads in full:

9. The legislative history of § 152 which DOE presents to us consists of 161 pages excerpted from the three-volume Losee Work, supra note 7.

10. *Message from the President of the United States on the Atomic Energy Act of 1946*, H.R. Doc. No. 328, 83rd Cong., 2d Sess. (1954).

11. *Piper*, supra, 502. F.2d at 1396, 183 USPQ at 237.

12. *Piper*, supra, 502 F.2d at 1396, 183 USPQ at 238.

5. Liberalize the patent provisions of the Atomic Energy Act, principally by expanding the area in which private patents can be obtained to include the production as well as the utilization of fissionable material, while continuing for a limited period the authority to require a patent owner to license others to use an invention essential to the peacetime applications of atomic energy.

The *Piper* majority further stated:

Our conclusion is reinforced by the apparent lack of an essential or fundamental relationship which appellants' invention [the Piper pill] bears to the production or utilization of special nuclear material or atomic energy.[12]

The *Piper* majority did correctly state that *one* of the *objectives* of the recommended 1954 amendments was to broaden the participation of domestic industry in atomic research by liberalizing the "area in which private patents can be obtained"; President Eisenhower expressed a desire[13] to expand private, domestic development of atomic energy. Noting that industry had already devoted private capital to its collaborations with the AEC, the President wanted to spur *private* investment in atomic research. He believed that entrepreneurial development would be the most efficient way to develop a promising power source.

However, it does not follow that every amendment which passed in 1954 was designed to promote the narrow objective set forth in one of the five "amendments" (*not* "objectives") recommended by President Ei-

13. The President began his message by listing the following general objectives:

First, widened cooperation with our allies in certain atomic energy matters;

Second, improved procedures for the control and dissemination of atomic energy information; and

Third, encouragement of broadened participation in the development of peacetime uses of atomic energy in the United States.

However, these should not be confused, as in the *Piper* majority opinion, with the recommended amendments which appeared toward the end of the message.

senhower. Section 152 deals with *owner-ship*, not with the *area* in which private patents *can* be obtained if private capital pays for the development. Inventions made or conceived for the government under contract were not within the "liberalizing spur" which the President wished to apply to the domestic technological industries. A fortiori, absent express congressional intent to the contrary, a statute permitting DOE to waive title, an option which § 152 vests in it, must not be interpreted by examining contemporaneous statements directed toward expanding patent protection to previously-foreclosed, *privately*-funded inventions.

Study of the joint congressional hearings on amendments to the Atomic Energy Act of 1946 in June of 1954 shows that there was concern over how expanding the scope of private patent protection would interface with the ownership of inventions made or conceived under government contract. Representative Cole, Chairman of the Joint Committee, analogized the effect of § 152, then in the making, on private patent rights to the then-existing compulsory assignment policy of the AEC. The following exchange illustrates the thinking which resulted in § 152:[14]

> Chairman COLE. Mr. Strauss, Mr. Holifield has referred to the fact that the law requires employees of the Public Health Service, I think it was, to make available any patent it may want to public use without pay. Is it not a fact that employees of the Commission, if they develop any patent in the atomic energy field, are required to turn that patent over to the Commission?
>
> Mr. PRICE. I believe every employee has to sign a patent agreement to that effect.
>
> Chairman COLE. Of course, and that is the general and accepted practice.
>
> Mr. PRICE. General in the Government, I understand.

> Chairman COLE. Of course, anybody that gets his support from the Government, if Government funds contribute in any respect toward the development of the idea, that idea should belong to the public.
>
> Mr. STRAUSS. That is also general in industry.
>
> Chairman COLE. Now you indicated the only objection, I think, you have to this proposed section 152 is with respect to patents conceived on Commission contracts. That concept I discussed with you, of allowing people to have their patent, if they got in on their own, but if they got in on Government time, it still belongs to the Government. You have indicated that the main objection would be the idea of policing it and determining when the idea was conceived. But now in your own contracts with your contractors you have provisions that any invention that is conceived or made during the course of that contract belongs to the Commission. Do you not have the same problem there of determining whether the idea occurred before the contract, during the contract, or sometime after the contract?
>
> Chairman COLE. But that is true with your contractors also. That idea may develop 10 years later. If you can show that the idea originated during the course of the contract, you are going to go after it. So that problem does not enter.

Thus, Chairman Cole analogized the effect of then-proposed § 152 to that of the contemporary policy of AEC to expressly incorporate in their contracts provisions for obtaining patent ownership. In both cases the government could secure patent rights in inventions made or conceived for its benefit. However, the difference between the two is that under § 152 a silent automatic ownership option is created whereby the government need not expressly contract to get the patent rights.

---

**14.** *Proposed Amendments to the Atomic Energy Act of 1946: Hearings on S. 3323 and H. R. 8862 before the Joint Committee on Atomic Energy*, 83rd Cong., 2d Sess., (1954), pp. 667–

68. In the following exchange Mr. Strauss was then Chairman of the AEC while Mr. Price was Deputy General Counsel of the AEC.

The ownership objective of § 152 is also clearly demonstrated in the presentation to the House of the Conference Report for H.R. 9757.[15] As is often the case, the Senate and House differed as to how the 1946 Act should be amended. In particular, the Senate did not wish to permit private patents for inventions in the atomic energy field. As the report states:

### PATENTS

The House bill and the Senate amendment both provided, as does the Atomic Energy Act of 1946, as amended, that there shall be no patents issued in the field of atomic weapons. With respect to other areas in the atomic energy field the House bill permitted normal patents. However, it required that inventions or discoveries made under contract or other arrangement with the Commission shall be deemed to have been made by the Commission and patents therefor shall be the property of the Government unless the commission either waives its claim or its claim is not held valid by the Board of Patent Interferences. The House bill provided a procedure for testing out the question of whether or not inventions were made or conceived under contract with the Commission, using the Board of Patent Interferences as the deciding tribunal. Each applicant for a patent in the atomic energy field would be required to file with the application for such patent a statement under oath setting forth the facts surrounding the making or conceiving of the invention. The Atomic Energy Commission would then be provided an opportunity to review the statement, and if it believed that the invention was made under a contract or other arrangement with the Commission, the Commission would be authorized to direct the Commissioner of Patents to issue the patent to the Commission. If the applicant should not concur, he would be given an opportunity for a hearing before the Board of Patent Interferences. This

Board would then have to decide when the invention was made and whether, under all the circumstances, the Commission's claim was valid. The resolution of any question of when an invention is made or conceived is, of course, a normal function of the Board of Patent Interferences.

The Senate amendment did not have this protective device to insure that the Commission would receive all of the patents which properly belonged to it. Instead it authorized the Commission to require compulsory cross-licensing of inventions of primary importance in the field. It also provided for the use by others of patents found by the Government to have been used by their owners in violation of the antitrust laws.

The committee of conference chose to somewhat different approach to the problem so as to avoid as far as possible doubt as to the constitutionality of the licensing system. Therefore, the committee of conference accepted provisions requiring the Commission to give preferred consideration for commercial licenses in the next 5 years to those applicants who agree to make their atomic energy patents available to all other Commission licensees who demonstrate need therefor upon payment of a reasonable royalty to be determined in accordance with the provisions of the act. In addition the committee of conference retained the House provision affording protection of the Commission's interest in patents conceived under contract or other arrangement with the Commission.

In lieu of having a House clerk read the statement accompanying the presentation of the Conference Report to the House, Chairman Cole offered a verbal explanation of the manager's statement about the Report.[16] On the floor, he said, in pertinent part:

The other major point of difference was with respect to patents and what should be done in this field. The present

---

15. H.R.Rep. 2639, 83d Cong., 2d Sess. (1954).

16. 100 Cong. Rec. 13071–13072 (1954).

law prohibits patents in the nonweapon field. This bill for the first time opens the door to private activity in the non-weapon phase of atomic development. As originally presented to the House, the bill contained a provision authorizing the compulsory licensing of any patent which might flow from this private operation for the next 5 years, irrespective of the association which that patent owner might have had with a publically sponsored program.

After some discussion, the House accepted the amendment which was offered by myself, eliminating the compulsory feature, the basic argument against it being that it is of such doubtful constitutionality as to make it unwise for its adoption at this time.

At any rate, the House eliminated that provision and inserted in place of it the requirement that all patents which are conceived during the course of *any association* which an individual may have with the Government—employees of these large contractors, or small contractors— all of the people who have been in this program from the beginning or any persons who may become identified with the program—*patents which flow from that association become the property of the United States.* All other patents acquire the same status as normal patents. That was the substance of the amendment adopted by the House by a substantial margin.

The conferees took somewhat of a middle course. It retained the House provision on patents, so that we can be assured there will be no windfall to people who have been engaged in this program up to this time or in the future. The patents which those folks may discover are the property of the United States, unless the Commission may be willing to surrender its claim to a particular patent. [Emphasis ours.]

The apparent intent of Congress in the proposed 1954 Act was to "liberalize" the restrictive authority of the 1946 Act, permitting the issuance of patents in the atomic energy field to private parties where they have, without government association, absorbed the research and developmental costs. However, it also seemed eminently just to Congress that if an invention was made or conceived during such an association, the government should have a crack at title for the invention.

*Piper* went too far in equating "liberalization" with free government financing; and we are not persuaded that, except where the invention is absolutely necessary to atomic energy production, Congress meant to give away any interests or resources the government invested in that invention. Absent express congressional intent, we see no reason to go beyond the plain meaning of the words "useful in."

In view of the legislative history now before us, we do not feel that the granting of private ownership rights can be logically tied to an unnaturally constricted interpretation of the utility provision of § 152.

■ Certainly, an invention which is essential to the production of atomic energy is encompassed by the term "useful in," and, therefore, may be subject to a direction proceeding. Likewise, an invention having only an incidental use in atomic energy production is plainly outside the term "useful in," and, therefore, not subject to the direction proceeding. Between these limits, however, lies the gray area in which the present invention resides.

We approach this twilight zone guided by a "rule of reason." Is the subject invention reasonably related to a use in the production of special nuclear material or atomic energy? Each case must turn on its own facts.

An improved ion radiation detector is reasonably related to the above utility. Clearly, the watchdog use of this improved detector, which is no longer paralyzed by EMP, reasonably enhances the environmentally-safe production and handling of atomic energy.

■ We hold, therefore, that White's invention is "useful in the production or utilization of special nuclear material or atomic

energy" under § 152 and reverse the board on that point.

### Conception/Reduction to Practice During a Contractual Relationship

Proof relating to the date of White's conception *prior to* a § 152 contract has been excluded here by various rulings of the board. Without the benefit of the excluded evidence, the board held that the White detector was "made or conceived" after the REECO PO in the course of an arrangement benefitting DOE. However, White argues that the suppressed evidence would have destroyed the necessary "made or conceived" during a contractual link found to exist between him and DOE. In view of our decisions on the evidentiary questions on conception, hereinafter set forth, we pass directly to their consideration before addressing the issue of a contractual relationship.

### The Landers Deposition (Motion V)

Since Landers was present at White's deposition immediately before his own deposition,[17] the board questioned Landers' independent recollection and suppressed his testimony. The board noted that although the FRE have never been formally adopted for direction proceedings, Rule 615 provides a federal court with the power to sequester a witness upon request of counsel. Taking this power as a signal, the board reasoned that while it had no sequestration power, it did have exclusionary powers under 37 CFR 1.286. It applied that power.

█ While we can understand a concern over the weight given Landers' testimony, the damage wrought by the draconian remedy of exclusion outweighs any possible harm of supposedly tainted evidence. As pointed out in *United States v. Warren*, 578 F.2d 1058 (5th Cir. 1978), even violation of Rule 615 by a trial judge in a jury trial

context does not necessarily call for the automatic exclusion of evidence.

The proper solution would have been to admit Landers' testimony for what it was worth and to consider, in deciding the weight to be given to it, the possible effect of nonsequestration. This is especially true in view of DOE's full cross-examination of Landers.

### Exclusion of Rebuttal Exhibits Motion IV

In granting Motion IV, the board also suppressed four physical exhibits White wanted admitted into evidence. As a basis for its decision, the board recited that item 2 of White's rebuttal discovery paper referred to "documents" which actually were in part physical exhibits. Therefore, it concluded that no physical exhibits could be relied on by White since only "documents" were referred to in the notice. In addition, the board questioned the "proper rebuttal purpose" for the above physical exhibits.

To decide which of the physical exhibits, if any, White is entitled to use as part of his evidentiary record, we must first recount the sequence of events leading to the attempted introduction of these exhibits into evidence as part of White's *rebuttal* discovery papers.

On October 31, 1975, White served DOE with his discovery paper for his case-in-chief, pursuant to 37 CFR 1.287(a)(1). In the disclosure of witnesses to be called, Landers was listed but White was not. A list of things was also included in this paper. While exhibits No. 3 and No. 4 were included in this list, exhibits No. 2 and No. 2–C were not.

DOE walked out on the deposition of White on December 11, 1975, after registering a complaint with White's attorney regarding noticing White in view of the absence of White's name from the discovery paper. Before the deposition, DOE had filed an objection with the board under 37

---

**17.** DOE did not cross-examine White at this deposition having walked out after protesting inadequate notice. Acting on a subsequent objection by DOE to the inclusion of White's testimony of December 11, 1975, the board excluded this deposition from White's evidentiary record. *See Exclusion of Rebuttal Exhibits (Motion IV)*, infra.

CFR 1.285(a)[18] about the irregular procedure used by White.

Treating the objection as a motion for an order of nonreliance, on January 28, 1976, the board ordered White not to rely on the original White deposition of December 11, 1975.

After having failed to enter the excluded physical exhibits as part of White's testimony-in-chief, White attempted to get them considered by the board as part of his rebuttal.

In the present instance, the board concluded that the only proper rebuttal purpose for the excluded exhibits was to counter the derivation charges of DOE. By proving conception prior to the Gripentog meetings, White could undercut any charge that White derived the invention from Gripentog at those meetings. However, since the board refused to consider any arguments concerning derivation in a direction proceeding, a point not contested here, it held that the exhibits lacked any proper rebuttal purpose, and, therefore, must be excluded even though they conceivably could have been properly admitted as case-in-chief evidence.

As the board said:

The provisions of 37 CFR 1.287(a) are *discovery* rules separate and distinct from the *notice* rule of 37 CFR 1.273 and so the White argument concerning "notice" is irrelevant. The party White clearly did not provide the requisite discovery for his testimony-in-chief in failing to list White as a witness. Therefore, the prohibition of 37 CFR 1.287(d)(1) is mandatory upon being raised by an opponent. The board has no discretion in the matter and does not have the authority to waive the rule. That option lies only with the Commissioner under 37 CFR 1.183. Aside from such waiver, the rules provide a remedy by way of a "prompt" motion under 37

CFR 1.287(d)(1) to add such a witness together with a motion under 37 CFR 1.281 for additional testimony-in-chief time to retake the White deposition. As White did not timely seek such a remedy, we believe White should not be allowed to do indirectly that which he failed to do directly. If such a party were able to wait to submit as a "rebuttal exhibit" any deposition improperly taken during testimony-in-chief there would be little motivation to follow the established procedures and rules and his opponent would be left uncertain as to the need for rebuttal during his testimony time.

While we agree with the above differentiation between notice and discovery rules, we note that the board's decision to exclude the four physical exhibits was predicated on the exclusion of both the Landers testimony and the original White testimony. The exhibits in question were introduced during each of these depositions in the case-in-chief testimony period. Since we now overrule the exclusion of the Landers testimony, supra Motion V, we must reevaluate the exclusion of these exhibits.

A physical exhibit is usually entered into evidence before the board by first listing it in a discovery paper, 37 CFR 1.287(a)(ii), and then offering it for authentication during a noticed deposition, in accordance with the Federal Rules of Evidence. However, as noted by the board, if one fails to list a thing, the omission can be corrected by a prompt motion which shows cause therefor, 37 CFR 1.287(d)(1).

■ White did list two of the four physical exhibits in his original discovery paper of October, 1975, namely, exhibits Nos. 3 and 4. They were offered as evidence during the Landers deposition of December 11, 1975. Therefore, Landers' testimony being admissible, as we have found, exhibits Nos.

---

**18.** § 1.285 *Effect of errors and irregularities in depositions.*

Notice will *not be taken* of merely formal or technical objections which shall not appear to have wrought a substantial injury to the party raising them; and in case of such injury it must be made to appear that, as soon as the party

became aware of the ground of objection, he gave notice thereof.

(a) *As to notice.* All errors and irregularities in the notice for taking a deposition are waived unless objection is promptly made and served in writing upon the party giving the notice.

3 and 4 are likewise admissible. It does not matter that the original White testimony was inadmissible and the board should have considered these exhibits.

Exhibits Nos. 2 and 2–C, however, are in a different posture. Although these two exhibits may have been properly introduced into evidence at the Landers deposition, White did not include them in his discovery exhibit list, and, therefore, did not satisfy the discovery requirements of 37 CFR 1.287(a)(ii). Having made this error, White failed to remedy it by means of a 1.287(d)(1) motion. White could and should have corrected his discovery "notice" error before his rebuttal testimony period. Therefore, exhibits Nos. 2 and 2–C were correctly excluded.

Since DOE must prove that the REECO PO was a "contract, subcontract, or arrangement" benefitting DOE, we now turn to whether the board properly held that the REECO PO was such an arrangement.

### Arrangement Benefitting DOE

Since without the excluded evidence White was unable to prove a conception date before the REECO PO, we need only look as far back as the REECO PO for an arrangement benefitting DOE. We begin by noting that it is not necessary for DOE to prove that a *contract* existed as of the conception or reduction to practice which benefitted it. All § 152 requires is that an *arrangement* existed which benefitted DOE.

White testified that during meetings with Gripentog he wanted to "get the government interested in" his detector. Even more revealing, in a meeting with Gripentog on January 28, 1970, White also testified that he was "interested in anything I could do to get orders, especially large orders, and get into the [Nevada] test site for the military possibility of my equipment." From this testimony it certainly appears that White knew of REECO and its position as a contractor for DOE at the Nevada test site. White wanted to get work for the government and knew that REECO did work under contract for it at the test site.

Therefore, the board was correct in concluding that when White replied to the RFQ which he received from REECO, he knew that DOE would benefit from any bid he submitted. That was his goal, to draw DOE's attention to his manufactures.

■ It is irrelevant that White might not have appreciated that he might lose the patent rights to his alleged invention if he came forward with a bid. Section 152 does not require that the inventor must knowingly enter a contractual arrangement that benefits the government aware that he can lose his patent rights to an invention meeting the § 152 utility requirement solely as a consequence of entering such a relationship. Simply responding to a purchase order benefitting a known DOE project satisfies the "arrangement entered into with or for the benefit of [DOE]" provision of § 152.

### Summary

After reviewing the legislative history now before us, we find that the utility question under § 152 should be resolved by employing the ordinary meaning of the phrase "useful in." When Congress enlarged the scope of patent protection available to private inventors, it did not seek to limit government ownership of patents for inventions growing out of work done under contracts with the government.

Employing a rule of reason, the evidence when viewed as a whole leads us to the conclusion that the present ion detector falls within the above utility requirement of § 152.

The exclusion of Landers' testimony and certain physical exhibits casts doubt upon that part of the decision below which establishes the conception and/or actual reduction to practice of the ion detector during or in contemplation of a contractual arrangement between DOE and White. This testimony allegedly proves that White invented the present detector prior to government involvement. While possibly diminished in value, Landers' testimony appears to be relevant and should have been admitted and weighed. Exclusion was too harsh a remedy.

Physical exhibits Nos. 3 and 4 were also excluded without proper justification. The discovery rules were designed to inform parties of relevant evidence by reasonable notice, thereby eliminating the element of surprise. Since these exhibits were listed in the original discovery papers, they satisfy the discovery rules and are admissible along with the Landers deposition wherein they were introduced.

As to physical exhibits Nos. 2 and 2–C, however, they are inadmissible because they were not listed in the original discovery paper. White's failure to avail himself of the 1.287 remedy cannot be corrected by subsequently listing these documents in a rebuttal discovery paper.

### Conclusion

Therefore, that portion of the board decision pertaining to utility is *reversed* for the reasons detailed above.

We also *remand* the contractual arrangement for DOE's benefit issue to the board for reconsideration. Upon admitting the improperly excluded evidence, the board should review *all* evidence bearing on the existence of a "contract, subcontract, or *arrangement* entered into with or for the benefit of [DOE]" (emphasis ours) before White's conception and/or reduction to practice of the ion detector. Thus, it is not restricted to considering only activity bearing on a contractual arrangement which occurs on or after the effective date of a formal contract. Upon determining the earliest existence of a § 152 arrangement, the board should then determine whether this date is preceded by White's conception date.

*REVERSED AND REMANDED.*

MARKEY, Chief Judge, concurring.

I join in the opinion portions relating to conception and reduction and to Motions IV and V. I cannot join in what I view as dicta concerning congressional intent. I concur in the result reached in the opinion portion under the Utility Issue because I consider the invention here as clearly "useful in, etc." and entirely distinct from that in *Piper.* As the majority opinion recognizes, each case must be decided on its own facts, and that fact is enough for me.