**Raymond BENN, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 94–CF–172, 98–CO–1854.**

District of Columbia Court of Appeals.

Argued April 30, 2002.

Decided June 27, 2002.

Jaclyn S. Frankfurt, Public Defender Service, with whom James Klein and Richard Greenlee, Public Defender Service, were on the brief, for appellant.

Valinda Jones, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and John J. Soroka, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, RUIZ, and GLICKMAN, Associate Judges.

SCHWELB, Associate Judge:

On November 3, 1993, a jury found Raymond Benn guilty of felony murder while armed, D.C.Code §§ 22-2401, -3202

(1981),[1] and of related kidnapping, assault and weapons charges, in connection with the armed kidnapping and the shooting death of Charles "Sean" Williams on December 1, 1992. Benn filed a timely notice of appeal. The appeal was held in abeyance to permit Benn to file a motion for a new trial, which he did on February 14, 1997, alleging *Brady* violations.[2] On November 11, 1998, following an evidentiary hearing, the trial judge denied the motion for a new trial. Benn again appealed, and the two appeals were consolidated.

On appeal, Benn contends, *inter alia,* that the trial judge erred by declining to permit Benn's attorney to recall to the stand Benn's mother, who had been present in the courtroom, in violation of the rule on witnesses, while her son was testifying. Counsel proposed to call the mother to corroborate Benn's testimony that, on advice of counsel, Benn and his mother had not discussed Benn's case and, in particular, his alibi defense.

We agree that Benn's mother should have been allowed to testify, and that the trial court's error in declining to permit her to do so was not harmless. Accordingly, we reverse.

# I.

## THE FACTS

### A. *Background.*

The government's evidence at trial established that two individuals forcibly brought the decedent, Charles Williams, to the apartment of his fiancée, April Mahoney, in southeast Washington, D.C., on the evening of December 1, 1992. After searching for money, the two men forced the decedent out of the house and into a waiting car. Early the next morning, the decedent's body was found on a dark and deserted path behind an elementary school. He had been shot several times at close range.

The government's theory at trial was that this homicide was perpetrated by the men who were last seen with Williams, and that it was prompted by Williams' failure to resolve an unspecified debt. The prosecution presented identification testimony from individuals who were in the apartment—all members of the Mahoney family—to the effect that Benn was one of the men who accompanied Williams to the Mahoneys' home. The defense was alibi. Benn's mother, Mrs. Diane Thomas, testified that Benn was at her house in Wheaton, Maryland, on the night Williams was killed. Benn took the stand on his own behalf and testified to the same effect.

### B. *The prosecution case.*

The government's case consisted of the identification of Raymond Benn by five witnesses as the taller of the two individuals who had accompanied the decedent to April Mahoney's apartment. All of the identification witnesses were members of the Mahoney family, and none of them had any prior acquaintance with either of the two men who were with Williams. There was no physical evidence connecting Benn to the homicide, and the defendant did not implicate himself in the killing when questioned by the police. The prosecution presented no evidence that Benn had a motive to kill Williams.

The government witnesses testified that, at the time of his death, Williams was living with April Mahoney and her family in the Mahoneys' apartment. In the evening of December 1, 1992, Williams left the

---

1. Recodified at D.C.Code § 22–2101, –4502 (2001).

2. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

apartment with his friend, Victor Blassingame. Approximately one hour later, some time between 8:30 and 9:00 p.m., Williams returned with two men—one tall and one short. At trial, five members of the Mahoney family described the events that followed.[3]

According to the prosecution witnesses, Williams entered the apartment with the two men and walked into April Mahoney's bedroom. Despite the cold weather, he was wearing only a t-shirt, and he was bleeding from a cut on his head. When the three men arrived, April Mahoney, her nephew Darrin Mahoney, and her baby were all seated in the bedroom. The tall man, wearing glasses, held Williams by the back of his clothes. The short man had placed a pair of child's panties over his head, and Marcelle Mahoney saw the butt of a handgun in the short man's hand. Williams approached the bed and lifted the mattress, apparently in search of something, but he did not find anything. The three men then left the bedroom.

Willie Mae Mahoney confronted the two men with Williams. She told them: "I'm not going to have no violence, and don't disrespect my home." The taller man assured Mrs. Mahoney that no disrespect was intended. Mrs. Mahoney asked Williams if he was O.K., and Williams turned to look at her. Williams did not respond, but according to Mrs. Mahoney, he looked "just pitiful." The tall individual said: "He's all right. He has to settle a debt." The witnesses testified that Williams was then "yanked" or "yoked" out of the apartment through the front door.

April Mahoney's brother, William Mahoney, followed the three men outside. He saw the two strangers place Williams in a dark-colored automobile, and then the car sped away. While her brother was outside, April Mahoney called the police and reported the events that she had just observed. All five witnesses acknowledged at trial that prior to December 1, 1992, they had never seen either of the two men who had accompanied the decedent to the Mahoneys' apartment.

Williams' body was discovered near the elementary school between 3:00 and 4:00 a.m. The decedent was clad in a t-shirt, and he was not wearing a coat. There was duct tape around his wrists and mouth. The police found forty-five dollars in currency sticking out of Williams' pants pocket. Near the body, a crime scene search officer recovered four live rounds of 9 millimeter ammunition and one 9 millimeter shell casing. The medical examiner found that Williams had been shot several times and that he had died as a result of gunshot wounds.

Officers subsequently showed each of the five Mahoneys a photo spread that included a photograph of Benn. All five selected Benn's photo, but the identifications were less than overwhelming. Darrin Mahoney told the police that Benn's photograph "looks like the person" or "looks like the tall guy." April Mahoney stated that "he looks like the guy." Willie Mae Mahoney told the officers that Benn's photograph resembled the tall person "if his face was slimmer." Marcelle Mahoney commented that the photograph "looks like the person." Three of the witnesses, when viewing the photo array, asserted that they were "95% sure" that the man in the photograph was the taller of the two individuals who had come to the Mahoney apartment with the decedent. The trial

---

**3.** The five Mahoneys who testified were the matriarch of the family, Willie Mae Mahoney, her adult son William, her adult daughter April (the decedent's fiancée), and Willie Mae's grandsons, Marcelle (14) and Darrin (13).

judge was "struck by the fact that all [the witnesses] use ninety-five." At trial, all of the Mahoneys positively identified Benn in the courtroom, although several made statements that arguably cast doubt on their identifications.[4]

Based on the Mahoneys' responses to the photo spread, an arrest warrant for Benn was prepared and executed. Following his arrest, Benn spoke to homicide detectives and provided them with an oral statement. He asserted, as he did at trial, that he was at his mother's home on the night of the murder. Benn was never placed in a line-up, and the second suspect who was with Williams on the night of his death was never identified or apprehended.

## C. The defense case.

The defense theory of the case was that Benn was not involved in the homicide. Benn's mother, Mrs. Thomas, and Benn himself both testified that Benn was at his mother's home in Wheaton, Maryland, on December 1, 1992. Mrs. Thomas, an employee of the Department of Energy, recalled the date because it was her birthday, and because Benn had given her a teddy bear that night as a birthday present. The prosecutor's cross-examination focused on Mrs. Thomas' lack of knowledge of her son's whereabouts during the time that Mrs. Thomas was sleeping.[5]

Mrs. Thomas was not asked whether she had discussed the alibi with her son.

Benn testified on his own behalf. He claimed that on December 1, 1992, he had spent the night at his mother's house. He remembered the date because it was his mother's birthday, and because he had given her a teddy bear that evening as a gift. Benn stated that he did not leave his mother's house after she went to bed and that he woke up there the next day. He denied that he had killed Williams or that he had entered the Mahoneys' home. Benn further testified that there were no unfriendly feelings between him and the decedent and that Williams did not owe him any money. Benn also testified that he did not wear glasses.[6]

## D. The inquiry into whether Benn and his mother discussed the alibi.

The bulk of the prosecutor's cross-examination of Benn consisted of questions that moved chronologically through the government's version of the events leading up to the homicide. Benn repeatedly denied any involvement in the offense, but he acknowledged that, as the defendant, he had an interest in the outcome of the case. The prosecutor then turned to the primary theme of his cross-examination, namely, that Benn must have coordinated his alibi with his mother. The prosecutor asked:

Q: You talked to your mother about the case, right?

4. For example, April Mahoney told a defense investigator: "[T] he only thing I really remember was the glasses. I tried not to look at him in the face." William Mahoney told the police that the tall man weighed about 230 pounds, but Benn weighed only 170.

5. Mrs. Thomas testified that she went to bed at 9:00 p.m. According to the prosecution witnesses, the two men and the decedent entered the Mahoneys' apartment between 8:30 and 9:00 p.m. Given the distance between Wheaton, Maryland, and southeast Washington, it would have been impossible for Benn to have been at the Mahoneys' apartment with Williams if Mrs. Thomas' alibi testimony was true.

6. All of the prosecution witnesses testified that the tall man with Williams wore glasses. Although Benn's need or lack thereof for glasses could perhaps have been explored by both parties, it apparently was not. The prosecutor implied that Benn wore the glasses, as well as a skull cap, as a disguise. Benn denied that this ever occurred.

A: No, sir.

Q: You mean to tell me that the lady that just testified before you, who[] you say is your mother, you never talked to her at all about this case?

A: No, sir.

Q: And she never asked you about this case, did she?

A: No, sir.

The prosecutor spent the remainder of the cross-examination hammering home the point that Benn claimed never to have communicated with his mother about his whereabouts on the night of the murder, and setting the stage for an argument that such a claim was inherently improbable. The questioning included instances in which the prosecutor put hypothetical words in the mother's mouth:

Q: She never said, "Raymond, how could they accuse you of something like that? Honey, you were at home with me. Remember, you gave me, you and Roland and Ronald gave me a teddy bear. Remember that?" She never talked to you about that?

A: No sir.

. . .

Q: And when she found out that you were facing these charges, she never came to you and said, "I'll go down there, I'll get up on that stand and I'll tell them where you were?"

A: No sir, she did not.

There was no contemporaneous objection to any of these questions. When the prosecutor, again without objection, inquired whether Benn had spoken to his brother about the offense, Benn replied that he had never discussed the case with anyone "besides my lawyer [and] my investigator."

On redirect examination, in response to questions by his own attorney, Benn ex-plained why he did not discuss the alibi with his mother:

Q: Mr. Benn, why? Why is it that you didn't talk with your mother about a homicide case that you are charged with?

A: Because you told me never to talk to nobody about my case.

Q: When did I tell you that?

A: I believe the day that we met, the first day, I think the next day when I went to court, on the 23rd, I be-lieve.

Q: Did you follow my advice?

A: Yes, sir.

E. *The defense's attempt to recall Mrs. Thomas.*

After completing the redirect examina-tion, defense counsel stated that "in light of those last questions," he would like to recall Benn's mother to the stand. The trial judge immediately summoned counsel to the bench and noted that Mrs. Thomas had been in the courtroom while her son was testifying.

This was not the first time that the question of Mrs. Thomas' presence in the courtroom had arisen. Earlier in the pro-ceedings, during a motions hearing, the judge and the attorneys discussed a de-fense request for the production of Mrs. Thomas' grand jury testimony. When the judge was about to rule on the request, Benn's counsel said: "I think I should ask [Mrs. Thomas] to leave at this point just because she may hear our analysis." The judge had not known that the defendant's mother was in the courtroom, and he ex-pressed concern that she had heard some of the discussion. The judge stated that "[s]he shouldn't have been here from the very beginning, as you well know." Benn's attorney stated that he was not sure whether he would call Mrs. Thomas

as an alibi witness, and the judge asked Mrs. Thomas if she would mind waiting outside in the witness room. Mrs. Thomas left as directed. The defense was thus on notice that the judge expected witnesses to be excluded from the courtroom.

When the parties approached the bench after Benn's attorney attempted to recall Mrs. Thomas as a defense witness, the following colloquy ensued:

> THE COURT: Why did you let her go ahead and sit in the courtroom?
>
> DEFENSE COUNSEL: I didn't know they were going to stay in the courtroom. I would suggest to the court that she is under oath. She is going to give her answers no matter what.
>
> THE COURT: If [the prosecutor] doesn't object, that's one thing, but we put her out for the very reason that if she stayed in, she wouldn't be able to testify.
>
> DEFENSE COUNSEL: I didn't have a chance to jump up and ask her to leave when these questions were asked.
>
> THE COURT: You did have a chance.
>
> PROSECUTOR: However, she knew about those rules when she was sitting in motions hearing and she was the specific person identified by [Benn's attorney].
>
> THE COURT: Besides, you wouldn't know whether they talked about it anyway.
>
> DEFENSE COUNSEL: No, but the question I would ask her is did you speak to him and why did you not speak to him.
>
> THE COURT: That's the very reason she can't give the answer if she has been sitting here in the courtroom. . . . I'm sorry Mr. [defense counsel]. It's almost precisely the

reason for the rule on witnesses, so she can't conform her testimony to the testimony of her son.

Benn's attorney explained that he proposed to call Mrs. Thomas in order to expose as inaccurate the prosecutor's alleged implication during cross-examination that Mrs. Thomas' answers regarding pretrial conversations would contradict her son's. Counsel stated that a "[p]art of the reason why I believe I should be permitted to call my client's mother is that these questions were not asked of her. I mean the suggestion is left that she might have a different answer [from Benn's], but the government didn't ask her any questions about it at all and, as I said, I mean there is no—that type of sandbagging allows the jury to be left with an inference that simply isn't true." Defense counsel further proffered to the court that he had instructed Mrs. Thomas, as he had instructed his client, not to discuss her testimony with anyone, and that this directive included any possible conversations with her son.

After further discussion, the judge ruled that Mrs. Thomas would not be permitted to take the stand again. Benn's attorney then requested the court to "instruct the jury that there is such a thing as a rule on witnesses and because [the mother] was in the audience, she cannot be recalled." The judge declined to give the requested instruction. The judge also permitted the prosecutor to argue that Benn's testimony regarding his and his mother's failure to discuss Benn's alibi was incredible. Specifically, the judge told Benn's counsel that "[i]f [the prosecutor] wants to stand up and argue: 'Do you believe that, ladies and gentlemen? That's ridiculous.' . . . he is entitled to, and you are entitled to argue [that] there is no evidence that he talked to his mother, only evidence that he didn't." In further support of his ruling, the judge stated that the mother

sat there, and I looked right at her. In fact, as Mr. Benn was being asked for the fourth time, "You didn't talk to your mother about how you were home and the teddy bear?" She's shaking her head no from the back. She is not a witness that I would permit to testify, in . . . violation of [the] rule on witnesses.

### F. *The motion to strike and counsel's closing arguments.*

The following morning, relying on *Henderson v. United States,* 632 A.2d 419 (D.C.1993), Benn's attorney acknowledged that he should have objected earlier, but asked the court to strike the questions and answers dealing with whether, after the appointment of counsel, Benn had discussed the case with his mother. Defense counsel relied on *Henderson's* holding that it was improper to imply, in questions to the defendant and in argument, that the defendant's failure to proclaim his innocence to, or otherwise to discuss the case with, his father or roommates after counsel had been appointed, was evidence of guilt. Counsel argued that the questioning in *Henderson* was analogous to the interrogation of Benn in this case regarding Benn's claim that he did not discuss the alibi with Mrs. Thomas.

The trial judge ruled that *Henderson* was distinguishable because, in the judge's view, the questions asked by the prosecutor in the *Henderson* case differed in a dispositive respect from those propounded to Benn in the present case. The judge characterized the inquiry in *Henderson* as "If you are innocent, why didn't you tell anyone about it?" He described the questioning in the present case, on the other hand, as "If you knew you had the alibi, you certainly were going to check with the alibi witness to make sure she remembered it the same way you did, particularly since the alibi [witness] was your own mother." The judge was of the opinion that competent defense counsel would typically instruct a client not to discuss the case, just as the defendant in *Henderson* had been instructed. The judge believed, on the other hand, that Benn's case presented a "unique circumstance" in which, as the judge saw it, a competent attorney would provide different advice:

I think most people would agree that a competent attorney would not prohibit the client from talking to his own mother about the fact that he was with his mother at the time the crime occurred, both because it would result in some benefit to the client, and because it would be a natural obvious thing to do; where that same attorney might say, "Don't talk to anybody else about this crime or where you were on the night it occurred." So, I don't think this case is like *Henderson* at all. I don't think the examination by [the prosecutor] was in any way impermissible.

Benn's attorney made a motion for a mistrial. In the alternative, he requested the court to instruct the jury that a competent attorney would instruct his client to talk to nobody except counsel about the offense. Counsel stated that "I disagree completely with the court about even [whether] competent counsel would allow a client to talk to [his] mother. The U.S. Attorney's office regularly calls family members to the grand jury. As the court knows, it would be tactically unsound for a defendant to talk to anybody who could be called to the grand jury. . . ." The judge denied the defense request for a mistrial and for an instruction, and he repeated that it would be "perfectly proper" for the prosecutor to argue that Benn's responses to the questions posed on cross-examination seemed improbable.

In his initial closing, the prosecutor attacked Benn's alibi defense as unworthy of

belief. He then suggested that Benn had surely "discussed this matter with [his] mother. Clearly, she was able to recollect for [Benn], 'Son, don't worry. Remember, you were at home with me....'" The prosecutor returned to the theme later in the closing, characterizing as "implausible" and "unbelievable" Benn's testimony that he never discussed the alibi with his mother.

In response, defense counsel interposed an element of sarcasm: "So, he didn't talk with [his mother] after I told him to talk with nobody about anything. Find him guilty because his lawyer gave him advice that he followed." Subsequently, in rebuttal, the prosecutor argued:

Mr. Benn gets on the stand and says "I never talked about this case with my mother. Never talked about this case with my mother." And [Benn's attorney] tells you the reason because of that, ladies and gentlemen, is because "I told him not to." [Benn's attorney] said, "The reason that Mr. Benn did not talk to his mother about the case is because I ... told my client not to talk to anyone about the case." And, of course, that belies logic too. For [if] your relative, be it son or daughter, father, mother, or cousin, got into any trouble that you were concerned about; but, more importantly, allegedly knew about since it was your birthday, you would have talked about that case up and down, up and down. Mr. Benn, "Raymond, son, honey. Look, I will go down there. You

were with me on my birthday. Remember the teddy bear? Remember 9:00? Remember you were with me." That is only logical and natural.

## II.

## LEGAL ANALYSIS

### A. *The rule on witnesses.*

The trial judge's decision not to permit Benn's attorney to recall Mrs. Thomas to the stand was based solely on the apparent violation by Mrs. Thomas or by the defense of the rule on witnesses. But the authorities cited in this opinion narrowly circumscribe the circumstances under which a witness who has been present in the courtroom in violation of that rule may be barred from testifying. It does not appear that the trial judge considered these precedents, and his ruling cannot be reconciled with them.[7] Indeed, we agree with counsel for Benn that the remedy imposed by the court exceeded the scope of the violation, and that the judge dismissed without discussion lesser sanctions that would have mitigated any potential danger of prejudice to the prosecution.

 The "rule on witnesses," sometimes referred to as the sequestration of witnesses, is not codified in this jurisdiction, but it is deeply engrained in the common law.[8] It is rooted in a trial judge's broad authority to control trial proceedings in general and to sequester witnesses in particular. *Geders v. United*

---

**7.** In fairness to the judge, there is no indication that the defense brought to the court's attention the cases on which Benn relies on appeal. The underlying claim, however, was undoubtedly preserved. *See Yee v. Escondido,* 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (if a claim has been presented to the court from which an appeal has been taken, a party is not limited on appeal to the precise arguments made below); *West v.*

*United States,* 710 A.2d 866, 868 n. 3 (D.C. 1998) (same).

**8.** Federal Rule of Evidence 615, which deals with the "rule on witnesses," provides in relevant part: "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order on its own motion."

*States,* 425 U.S. 80, 87, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976). The rule serves a number of purposes. "It exercises restraint on witnesses 'tailoring' their testimony to that of earlier witnesses; and it aids in detecting testimony that is less than candid." *Id.; see also Gregory v. United States,* 125 U.S.App. D.C. 140, 147, 369 F.2d 185, 192 (1966) (the purpose of the rule on witnesses is to guarantee that the recollection of one witness is not affected by the testimony of an earlier witness or witnesses).

▮▮▮ Within certain limitations, "[t]he trial court has broad discretion in determining the appropriate remedy for alleged violations" of the rule on witnesses. *Bourn v. United States,* 567 A.2d 1312, 1317 (D.C.1989). The court's authority to impose the "draconian remedy," *United States Dep't of Energy v. White,* 653 F.2d 479, 490 (C.C.P.A.1981), of exclusion for a violation of the rule, however, is narrowly circumscribed. Over a hundred years ago, the Supreme Court made it clear that the violation of a sequestration order does not automatically disqualify a witness:

> If a witness disobeys the order of withdrawal, while he may be proceeded against for contempt and his testimony is open to comment to the jury by reason of his conduct, he is not thereby disqualified, and the weight of authority is that he cannot be excluded on that ground merely, although the right to exclude under particular circumstances may be supported as within the sound discretion of the trial court.

*Holder v. United States,* 150 U.S. 91, 92, 14 S.Ct. 10, 37 L.Ed. 1010 (1893). From the early twentieth century, the law in the District of Columbia has been that a witness who has violated a sequestration order may be excluded from the witness stand only under extreme and exceptional circumstances. In *District of Columbia v.*

*Flagg,* 42 App.D.C. 73, 77 (1914), the court explained:

> It is undoubtedly true that an instance might arise, as suggested in [*Holder*] where the court would be justified in refusing to permit such a witness to testify, *but it is the exception to the rule, and should be exercised only in an extreme case, and where it clearly appears that an injustice will result.* Before excluding a witness in any case, the court should inquire into the circumstances of the violation of the order, and unless it appears that the witness acted by the advice or collusion of the litigant on whose behalf he is to testify, he should not be excluded.

(Emphasis added); *accord, Jett v. Jett,* 221 A.2d 925, 927 (D.C.1966). In *Brown v. United States,* 388 A.2d 451, 456 (D.C. 1978), we went even further and stated that in order to justify exclusion of the witness from the witness stand, "[g]enerally, the violation of the [rule on witnesses] must be so egregious that it 'has somehow so discredited the witness as to render his testimony incredible as a matter of law.'" Although this articulation appears somewhat extreme—it is difficult to imagine a circumstance when a violation of the rule on witnesses would make a witness' account so incredible that no rational trier of fact could believe it—the government has not challenged the correctness of the *Brown* standard. Indeed, in its brief, the government has relied on the foregoing quotation from *Brown* in setting forth the applicable legal principles.

▮▮▮ In this case, so far as the record reflects, the trial judge did not engage in the analysis that is legally required before the "draconian" sanction of exclusion may properly be imposed. The judge apparently perceived exclusion to be the automatic remedy, or at least the presumed sanction, for a violation of a sequestration

order. But, as we stated in *Teachey v. Carver,* 736 A.2d 998, 1004 (D.C.1999),

> [a]n exercise of discretion must be founded upon correct legal standards. *See, e.g., In re J.D.C.,* 594 A.2d 70, 75 (D.C.1991). "A district court by definition abuses its discretion when it makes an error of law," *Koon v. United States,* 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

On this record, if the trial judge had considered the relevant factors in exercising his discretion, he could not properly have precluded Mrs. Thomas from returning to the witness stand. First, "the degree of fault or intent encompassed in the violation must be considered in ascertaining the propriety of any given sanction." *United States v. Rhynes,* 218 F.3d 310, 322 (4th Cir.2000) (en banc); *accord, Flagg,* 42 App.D.C. at 77 (the court should inquire into the circumstances of the violation to determine if the witness acted upon the advice, or in collusion with the litigant). In this case, circumstances of the violation were hardly sinister. After she gave her initial testimony, Mrs. Thomas remained in the courtroom to observe the remainder of her son's trial; there was, at that time, no evident reason to believe that she would be asked to testify again. There is nothing in the record to support an inference that Mrs. Thomas remained in the courtroom in collusion with Benn or his lawyer, in order to hear what other witnesses would say, or in order to adapt her own testimony to that of anyone else. Mrs. Thomas' son was on trial for murder, and it was not unreasonable on her part, after having been released from the witness stand, to want to follow the remainder of her son's trial. Having completed her testimony, Mrs. Thomas was unlikely to be recalled. The failure of Benn's attorney to foresee the possibility that further testimony from the mother would be required, to exercise special care, and to instruct the mother to remain outside the courtroom while her son was testifying, without more, was insufficient under the case law to serve as a basis for not permitting Benn's mother to testify.

Moreover, a witness may not be precluded from testifying unless the court has first considered whether the objectives of the rule on witnesses can be served by resort to lesser sanctions. *Brown, supra,* 388 A.2d at 456. Available remedies include "commenting to the jury on the witness' conduct, citing the witness for contempt, and allowing opposing counsel to cross-examine the witness on the nature of the violation." *Bourn, supra,* 567 A.2d at 1317. In *Hawes v. Chua,* 769 A.2d 797 (D.C.2001), the judge explained the rule on witnesses to the jury, and he instructed the jurors that they might properly consider a violation of that rule as a part of the calculus in assessing the credibility of a witness. *See also Rhynes,* 218 F.3d at 322–23 (discussing alternative sanctions). In this case, the prosecutor could have been permitted to cross-examine Mrs. Thomas regarding her presence in the courtroom during her son's testimony, and the judge could properly have instructed the jury, as in *Hawes,* that in assessing Mrs. Thomas' credibility, the jurors might appropriately consider the fact that in violation of the rule on witnesses, Mrs. Thomas heard her son testify on the very subject with respect to which she was giving evidence. These less extreme remedies would have served the purposes of the rule on witnesses without depriving the defendant of the opportunity to adduce the testimony of an important witness on a subject critical to the credibility of his defense.

Finally, there was no basis in the record for a finding that the violation of the rule on witnesses was "egregious" or that it " 'has somehow so discredited the witness

as to render [her] testimony incredible as a matter of law.'" *Brown*, 388 A.2d at 456.[9] The trial judge thought that Benn's attorney ought to have taken greater care to assure that any potential witness, even one who was not expected to testify further, remained outside the courtroom during the testimony. Be that as it may, there is not the slightest suggestion on this record of bad faith on the part either of Benn's attorney or of the witness. There is likewise no evidence that Mrs. Thomas violated the rule "with the connivance or knowledge of the party or his counsel," *id.*, and the judge made no finding of bad faith or collusion.

Indeed, when Benn's attorney announced that he wished to recall Mrs. Thomas, he had not had the opportunity to speak to her first. The timing of the request suggests confidence on counsel's part that Mrs. Thomas, like her son, would deny that the two of them had discussed the case or Benn's alibi. Counsel also proffered to the court: "I told her the very first time I called her to let her know about her son's case that she should not talk with him about anything. When I told her not to talk with him, I expected that would be what she did, and she didn't." *See* Rule 3.3, D.C. Rules of Professional Conduct ("a lawyer shall not knowingly ... make a false statement of material fact or law to a tribunal"). Mrs. Thomas' proposed testimony could logically be found to be "inherently incredible"

only if the court concluded not only that Benn's own testimony on the subject was false, but also that Benn's attorney, as an officer of the court, had misrepresented the advice he had provided to his client and to the client's mother. The judge did not make such a finding, and there was no basis in the record on which such a finding could have rested.

The government argues that Mrs. Thomas was properly barred from returning to the witness stand because "she had signaled her answers to the questions while [Benn] was testifying." This contention is predicated on the trial judge's comment that, while Benn was being asked for the fourth time whether he had talked to his mother about the events of the night of the murder, including the birthday gift of a teddy bear, Mrs. Thomas was "shaking her head from the back." Counsel for Benn responds in her reply brief that "it would not have been reasonable to conclude that the mother's head motion, made apparently when her son was asked the same question for the *fourth time*, could have been designed, or had the effect of 'coaching' an answer that her son had already stated three times." (Emphasis in original.) We agree. In fact, the judge appeared to be citing the mother's conduct as evidence that the mother had been present when her son testified, that she had heard and focused on his testimony, that she had implicitly (and perhaps improperly)[10] signaled her agreement with her son's ac-

---

9. After quoting, without questioning, the foregoing language from *Brown*, the government goes on to argue that the judge was confronted with "what appeared to be a knowing violation of the rule on witnesses and evidence *that testimony was possibly tainted by that violation*." (Emphasis added.) But a witness' testimony is "possibly tainted" whenever she has heard the testimony of another person on the same subject, and the case law cited by both parties, *e.g., Brown, supra,* 388 A.2d at 456, demonstrates that such a "possi-

ble" taint does not justify the draconian remedy of exclusion.

10. It is common knowledge among judges that courtroom spectators frequently, though inappropriately, make gestures indicating agreement or disagreement with the statements of witnesses, of lawyers, and occasionally, of the judges themselves. In this case, the trial judge did not direct Mrs. Thomas or any other spectator to desist from such conduct.

count, and that she would probably testify consistently with it. Such a scenario does not meet or even approach the demanding standard articulated in *Brown, supra,* 388 A.2d at 456, and the other authorities we have cited.

In sum, we conclude that the trial judge failed to apply the proper legal standard and that the "draconian remedy of exclusion [which the judge imposed] outweigh[ed] any possible harm of [the] supposedly tainted evidence." *White, supra,* 653 F.2d at 490. Under the correct standard, Mrs. Thomas should have been permitted to testify.

### B. *Harmless error analysis.*

■ Having determined that there was error, we turn to the question whether the trial judge's refusal to permit Mrs. Thomas to resume the stand warrants reversal. We conclude that it does.

■ Benn contends that the error was of constitutional magnitude, and that the burden is therefore on the government to demonstrate beyond a reasonable doubt that it was harmless. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). There is substantial case support for the proposition that the violation was of constitutional proportions. *See, e.g., Rhynes, supra,* 218 F.3d at 321 ("exclusion of a defense witness impinges upon the right to present a defense" (internal citation omitted)); *id.* at 325 (Wilkins, J. concurring) ("the exclusion of a defense witness implicates the defendant's due process right to present testimony in his own defense"); *United States v. Hobbs,* 31 F.3d 918, 921 (9th Cir.1994) (describing the right to call a defense witness who had violated rule on witnesses as a "constitutionally based right of the defendant to present evidence in his favor"); *Commonwealth v. Scott,* 496 Pa. 78, 436 A.2d 161, 163 (1981) (in a case involving a violation of

the rule on witnesses, "[t]o deny an accused the opportunity to present relevant and competent evidence in his defense would constitute a violation of his fundamental constitutional rights to compulsory process for obtaining witnesses in his favor and to a fair trial"); *State v. Leong,* 51 Haw. 581, 465 P.2d 560, 563 (1970) (holding that "the trial court erred in refusing to permit a defense witness to testify, under an order excluding witnesses from the courtroom, because by so doing it denied defendant this [Hawaii] constitutional right to have witnesses testify in his favor").

The government counters that the witness' testimony was not disallowed altogether, and that "where, as here, constitutional rights have not been completely foreclosed by erroneous evidentiary rulings, they are not subject to constitutional error review." The government has identified no precedent in a "rule on witnesses" case in which a court has so held; it cites only *Roundtree v. United States,* 581 A.2d 315, 329 n. 34 (D.C.1990), a decision which did not involve the rule on witnesses, or the question whether a witness had previously testified or not, but rather dealt with a relevancy ruling by the trial court. The government has cited no authority, and we are aware of none, supporting the proposition that, for the purpose of determining whether the error was prejudicial or harmless, the appropriate inquiry in a rule on witnesses case differs depending on whether a witness has not previously testified at all or whether he or she has previously testified and is being proffered to testify about a new subject. In fact, *Brown, supra,* 388 A.2d at 451, a case designated in the government's brief as one "chiefly relied upon," involved two witnesses—one that had never been called, and one that the defense sought to recall on a new issue. In articulating the standards that govern the remedy for a rule on witnesses

violation, we treated that question as being identical for each of the two witnesses. *See also (Rocky) Brown v. United States,* 683 A.2d 118, 124 (D.C.1996) (holding that while cross-examination is subject to reasonable limits in the discretion of the trial court, the preclusion of an entire line of relevant inquiry constitutes constitutional error). Accordingly, we are constrained to agree with Benn that *Chapman's* "harmless beyond a reasonable doubt" test applies to Benn's appeal.

Under the *Chapman* test, we cannot find the error harmless. With the lack of physical evidence, a confession, or the like, this case turned entirely on the jury's credibility determinations. It is difficult, from our appellate perch, to assess the strength of the prosecution's evidence, for we have not observed the witnesses. The government's case turns on the assumption that the men who brought the decedent to the Mahoney apartment murdered him. If that assumption is well-grounded, then the prosecution's evidence seems, at first blush, to be quite formidable, for Benn was identified by five apparently disinterested witnesses. But closer scrutiny places the strength of the case in substantial doubt. All of the witnesses were strangers to Benn.[11] When shown a photo spread which included Benn's picture, four of the five witnesses said that the photograph "looks like" the tall man who accompanied the decedent. Common sense tells us that many people resemble one another, and in that sense "looks like" is not really an identification at all. The purported coincidence that three of the witnesses described themselves as 95% certain understandably troubled the judge and indicates, at least, that someone probably suggested something to somebody. Benn was never placed in a line-up, and although all five witnesses "positively" identified him in the courtroom, it is difficult to hypothesize a more suggestive setting for an identifying witness, when the individual whom the witness had selected from the photo array was seated at the defense table, and the witness could infer that the police obviously believed that the man whose photograph the witness had described as "look[ing] like" the culprit was indeed guilty. Depending on how the prosecution witnesses came across, the government may have had a fairly decent case, but by no means an overwhelming one.

The defense, as we have seen, was alibi. The prosecutor was unable to shake the alibi itself, but he found an apparent chink in the armor of the alibi defense when Benn denied that he had discussed this very simple alibi—Benn was with his mother on her birthday—with the one person who could readily confirm it. The prosecutor repeatedly attacked Benn's testimony to this effect as incredible and as contrary to human experience and common sense—if a man had been in Wheaton, Maryland with his mother celebrating her birthday at a time when he was accused of

---

**11.** [T]he identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials.
*Webster v. United States,* 623 A.2d 1198, 1204 n. 15 (D.C.1993) (quoting FELIX FRANKFURTER, THE CASE OF SACCO AND VANZETTI (1927)). This passage by Professor (later Justice) Frankfurter was also quoted in *United States v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). *See also Wehrle v. Brooks,* 269 F.Supp. 785, 792 (W.D.N.C.1966), *aff'd,* 379 F.2d 288 (4th Cir.1967) ("[p]ositive identification of a person not previously known to the witness is perhaps the most fearful testimony known to the law of evidence"); *accord Webster, supra,* 623 A.2d at 1204 (quoting *Wehrle* ); *Jackson v. Fogg,* 589 F.2d 108, 112 (2d Cir.1978) ("convictions based solely on testimony that identifies a defendant previously unknown to the witness are highly suspect") (internal brackets omitted).

murdering someone in southeast Washington, D.C., then obviously he would have discussed this fact with his mother to make sure that she remembered, and that she could and would exonerate him. Setting aside any questions about the propriety of the prosecutor's argument, see note 13, *infra*, if the jury did not credit Benn's testimony that he never discussed his alibi with his mother, then it was more likely to disbelieve the alibi itself.

Benn's attorney proposed to attempt to rehabilitate Benn's credibility by presenting testimony from Benn's mother that would have corroborated Benn's account; mother and son did not discuss the case because Benn's lawyer told them not to discuss it. The trial judge's ruling, however, made it impossible for the defense to present this evidence. The consequence of this ruling was that Benn's testimony, which might well appear to a lay juror to be contrary to common sense, was uncorroborated. But this was not all. An impartial juror might reasonably have supposed that if Benn was telling the truth when he denied discussing his alibi with his mother, then the mother, who after all had already been on the witness stand and was therefore presumably available, could confirm for the jury that her son had been telling the truth. When the defense presented no testimony from the mother on a subject with respect to which her son's credibility had been so forcefully attacked, the juror might reasonably infer that the mother had not come forward to support Benn's account because she could not truthfully do so.

Moreover, the prejudice suffered by Benn as a result of his mother's exclusion from the witness stand was heightened by the manner in which the prosecutor articulated his assault on Benn's testimony. The reader will recall that the prosecutor repeatedly hypothesized what Benn's mother was likely to have said to Benn if she was, indeed, with him when he was allegedly elsewhere committing a murder. An impartial juror might well have expected that the mother would be asked whether she uttered words like those that the prosecutor had placed in her mouth, and that she would deny saying anything of the kind. When no such testimony was elicited from the mother, Benn's account may have appeared to that impartial juror to be very questionable indeed.

 In determining whether the error was harmless, we look to the closeness of the case, the centrality of the issue affected by the error, and any steps taken to mitigate the effects of the error. *Clark v. United States*, 593 A.2d 186, 193 (D.C. 1991) (citing *Gaither v. United States*, 134 U.S.App. D.C. 154, 172, 413 F.2d 1061, 1079 (1969)). The closeness of the case is difficult to evaluate without hearing the witnesses, but if Benn and Mrs. Thomas came across as credible, then the defense was a formidable one. The issue affected by the error—the credibility of Benn and of his alibi—was central to the case. The judge was asked to, but did not, take steps to mitigate the prejudice to Benn.[12] The government, in our view, has failed to demonstrate that the error was harmless

---

12. Benn's attorney requested the judge, in the event that Mrs. Thomas would not be permitted to testify, to explain the rule on witnesses to the jury. The judge declined to do so. If the jurors had known that Mrs. Thomas was ineligible to take the stand because she had remained in the courtroom, then this might have reduced the likelihood that they would draw unwarranted unfavorable inferences against Benn on account of his mother's failure to testify regarding whether or not there was any discussion between the two of them of Benn's alibi.

beyond a reasonable doubt.[13]

## III.

## CONCLUSION

For the foregoing reasons, in No. 94–CF–172, Benn's convictions are reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion. Benn's appeal in No. 98–CO–1854, on *Brady* grounds, from the denial of his motion for a new trial is dismissed as moot.

*So ordered.*

13. Benn also contends that the trial judge erred by permitting the prosecutor to question Benn about, and comment upon, Benn's testimony that, on advice of counsel, he did not discuss his alibi with his mother. Because we are reversing Benn's conviction on other grounds, we need not decide whether the judge's rulings with respect to this issue constituted reversible error. Although the issue is likely to arise again on retrial, we cannot now predict the context in which this may occur. We therefore decline to instruct the trial court with respect to the appropriate handling of the issue on remand, except to note that it is a sensitive one. *Cf. Hunter v. United States*, 606 A.2d 139, 143–44 (D.C.), *cert. denied*, 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992), and *Henderson, supra*, 632 A.2d at 419, in which we addressed issues different from, but somewhat related to, the one presented here.