

**In re D.E., Appellant.**

**No. 07–FS–524.**

District of Columbia Court of Appeals.

Argued Dec. 1, 2009.

Decided April 8, 2010.

---

Moses Cook, for D.E.

Sidney R. Bixler, Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief, for the District of Columbia.

Before REID and OBERLY, Associate Judges, and FERREN, Senior Judge.

OBERLY, Associate Judge:

Appellant D.E. was adjudicated a delinquent based on a charge of aggravated

assault.[1] The charge was founded on evidence linking D.E. to a group attack on a fourteen-year-old girl as the victim was riding home from school on a bus. D.E. appeals her adjudication of delinquency, arguing, first, that there was insufficient evidence of the victim's injury to support the charge of aggravated assault and, second, that the trial court erred in excluding the testimony of one of D.E.'s witnesses. D.E. also challenges on equal protection grounds her assignment to a so-called "girls' court" within the Family Court.

We reject D.E.'s challenge to the sufficiency of the evidence of aggravated assault, but we agree with D.E. that the trial court erred in precluding a witness from testifying and find that the error was not harmless beyond a reasonable doubt. We therefore reverse D.E.'s adjudication of delinquency and remand the case for a new hearing at which D.E. is permitted to call the excluded witness. Further, although the record contains no details concerning the status of "girls' court" since the proceedings below, the consideration of that issue by the Family Court during the time of D.E.'s adjudication may have a lingering impact on the retrial of her case before the same judge. In an effort to avoid any possible spillover effect on the remand proceeding attributable to the "girls' court" issue, and the events surrounding the proposed testimony of the defense witness who was precluded from testifying, the Family Court may wish to consider reassigning the case to another judge, consistent with the factors outlined in this opinion (*see* pp. 1214–15, *infra*) and the exercise of its discretion.

## I. Facts

On the evening of April 4, 2006, fourteen-year-old K.B. was riding home on a bus when several individuals began asking K.B. questions about her age and whether she was in a gang. K.B. became nervous and moved to the front of the bus, telling the driver that she was frightened. As K.B. stood behind the driver, the boys and girls who had been asking her questions—among them D.E.—approached her and continued questioning her aggressively. When the bus stopped at an intersection, the driver stood in front of K.B. and closed the front doors of the bus, telling the riders to exit through the back doors. Some, but not all, of the passengers followed the driver's instructions, and one boy who remained on the bus was the first to hit K.B. in her face, causing her to fall back onto the driver's seat. K.B. was unable to get up "[b]ecause other people started to come and jump on [her]." K.B. was hit by at least two other people while she was lying on the driver's seat. After a few minutes, K.B. "felt [herself] being pulled out of the [driver's] window" by her hair. K.B. saw that the person pulling her hair was D.E. As she was hanging out of the driver's window, K.B. was struck "numerous times" in her face. Eventually, the bus driver was able to pull K.B. back inside the bus.

By the time the assault had ended, K.B. was unable to see at all-her eyes were swollen shut and she was bleeding from her eyes, nose, and mouth. She also had a fractured nose that "hurt really bad." K.B. was taken to the hospital by ambulance and was released the following morning, but had to return to the hospital several times over the next week. She used medication in the form of eye drops for about three weeks. In addition, K.B. suffered "severe" headaches for three days after the attack, necessitating pain medication.

---

1. D.C.Code § 22–404.01(a) (2001).

K.B. experienced lasting effects from the attack. She was unable to see clearly "for about two months" because "[t]here was blood surrounding [her] eyes" and she could see form, but no detail. At the time of D.E.'s delinquency hearing, six months after the attack, K.B. was still experiencing "sharp pains" in her left eye. She stated that her left eye "[hadn't] recovered well like [her right eye]."

While K.B. was testifying at the adjudication hearing, a police officer approached the court and informed the judge that A.W., the mother of D.E.'s co-respondent, had been in the bathroom discussing K.B.'s testimony with D.W. and R.W., who were both witnesses in the case. We describe the ensuing inquiry by the trial court in some detail as it bears importantly on our resolution of D.E.'s challenge to the exclusion of a witness she had planned to call to testify in her defense.

The trial court first questioned A.W. at the bench:

THE COURT: Now, I did observe you go outside and stay for awhile and come back, did you talk with anyone while you were outside?

. . . .

MS. W.: No.

THE COURT: Is that right? You didn't see anyone you know?

MS. W.: Except for the girls that was out there earlier?

. . . .

MS. W.: Witnesses.

. . . .

THE COURT: Did you talk with them, did you talk with them when you were taking your break?

MS. W.: No, went to the bathroom. I had to go real bad.

THE COURT: And you didn't talk with anyone?

MS. W.: No, I told them, shhh, be quiet, because they was out there talking out loud . . . .

THE COURT: Okay, thank you.

The court next heard from two other girls who were to be witnesses and who had been in the bathroom, as well as the police officer, each of whom contradicted Ms. W.'s denial of having talked with the female witnesses during a break.

The court then called all of the potential witnesses, as well as Ms. W., back into the courtroom to make sure they understood they were not permitted to talk about anything they might hear in court with potential witnesses. The court spoke directly with Ms. W.:

THE COURT: I had asked you if you had discussed the testimony you heard in trial with anyone, and you told me no. And then a police officer who was in the bathroom with you came in and even though you held your head down while she was at the bench, she recognized you from the bathroom, she heard you discussing the witnesses' testimony with other people.

MS. W.: I was there by myself.

THE COURT: Ma'am, you're absolutely lying. Not only did the police officer hear you, the person that you talked to [D.W.] told me that you told her about the testimony of the complaining witness. What you did was reprehensible. You're interfering with your daughter's trial. This is a serious matter. You should be setting an example for her . . . . Now, I'm not going to report you to the U.S. Attorney's Office, but you could be prosecuted for that and what you did was wrong . . . .

MS. W.: I was.

. . . .

MS. W.: In there by myself.

THE COURT: Ma'am, that can not be true. . . .

. . . .

. . . . Ma'am, you're just lying, let it go. You're just digging yourself in deeper.

MS. W.: I'm not.

THE COURT: You're not lying? Fine. Raise your hand and go under oath. Right hand. Do you swear or affirm the answers to my questions the truth, the whole truth and nothing but the truth.

MS. W.: Yes.

After being sworn, Ms. W. told the court that she did not go to the restroom after the trial began and denied discussing the testimony of the victim, K.B., with anyone. The court again stated that it would defer to the U.S. Attorney's Office on the question whether to prosecute Ms. W. for perjury and directed Ms. W. not to return to the courtroom.

The court also called R.W. to testify under oath about the incident in the bathroom, but R.W. denied having discussed the case with A.W. or D.W.:

THE COURT: . . . Have you spoken with [D.W.] today?

[R.W.]: Yes.

THE COURT: What'd you talk about?

[R.W.]: We wasn't talking about nothing.

. . . .

THE COURT: So you sat there and said nothing to each other?

[R.W.]: We didn't talk about nothing big. We was just talking about what we're going to do after—

. . . .

THE COURT: Did you talk with her about this case?

[R.W.]: No.

THE COURT: No? Did you talk with her about any of the testimony from the courtroom?

[R.W.]: No.

THE COURT: Did you talk with her about any, any testimony from the courtroom?

[R.W.]: No

The court found R.W.'s denial incredible and determined that she would not be permitted to testify. The judge stated, "I think [R.W.'s] lying. [R.W.'s] looking evasive. She's giving developing answers, and she clearly knew that she wasn't to talk about the case with anyone. She won't be testifying." When told by D.E.'s counsel that R.W.'s answers to questions were, because of R.W.'s mannerisms, "short" and required follow-up questions, the court replied, "No, it's not a matter of her needing follow-up questions, she's intentionally misleading the Court under oath. If she's going to stand there and lie under oath standing there, there's no reason for her [not] to lie under oath sitting over there. . . . She's not qualified to testify." D.E.'s counsel then asked for a mistrial, stating that "if she's not going to testify then, you know, to be able to shift my whole strategy on the fly would be incredibly prejudicial; and I'd need some time—," to which the court responded, "Oh, you have the whole lunch hour" and denied the motion.

After the lunch break, D.E.'s counsel renewed his objection to the court's exclusion of R.W. as a witness and argued that even if the court found R.W.'s testimony about the conversation in the bathroom incredible, R.W. still should be allowed to testify, but that the court could consider the incident in deciding what weight to give her trial testimony. The court disagreed, stating that "[R.W.'s lying on the stand] goes to her credibility as well as her

willingness to disregard the instructions of counsel because you told me that you had instructed her not to discuss anybody's testimony. So she disregarded counsel's instructions and lied in court under oath about what she had done. So I don't see how she could give credible testimony." At this juncture, D.E.'s counsel understood that the court was not going to entertain further discussion of R.W.'s ability to testify and indicated he would move on to other matters. Counsel gave no proffer about what R.W.'s testimony would have been.

Thereafter, D.E. presented one witness in her defense, A.A., who testified that D.E. did not participate in the attack on K.B., and in fact, during the incident on the bus, D.E. had suffered an asthma attack and her friends had helped her to a nearby playground to get some water. The court did not credit A.A.'s testimony, in part because it was contradicted by D.E.'s own statement given to police officers at the time of the attack and in which she denied having hit K.B. but never mentioned an asthma attack.

At the conclusion of the hearing, the trial court found that D.E. was "involved in [the] aggravated assault of [K.B.] . . . in that she pulled the complaining witness out of a bus window by her hair and struck her when she was being [attacked] by a number of others and that it was [D.E.] who acted to incite the assault of the others by challenging [K.B.] and asking her was she a member of a gang. . . . Based on this testimony the Court [found] that [D.E.] caused serious bodily injury to [K.B.] and that she intended to cause a serious bodily injury by pulling her out of

a bus by her hair and striking her. She did so intentionally and knowingly."

## II. Discussion

### A. Sufficiency of the Evidence

▪ At oral argument in this court, D.E.'s counsel conceded that D.E., as part of the group of attackers, could be held responsible for the consequences of the group's attack.[2] Counsel argues only that K.B.'s injuries were insufficient to meet our standard for "serious bodily injury." We disagree.

To prove aggravated assault, the government had to show that D.E. "knowingly or purposely cause[d] serious bodily injury to another person; or [u]nder circumstances manifesting extreme indifference to human life, that person intentionally or knowingly engage[d] in conduct which create[d] a grave risk of serious bodily injury to another person, and thereby cause[d] serious bodily injury." D.C.Code § 22–404.01(a)(1) and (2) (2001). This court has emphasized the "high threshold of injury" that the government must prove to support a conviction on an aggravated assault charge. *In re P.F.*, 954 A.2d 949, 952 (D.C.2008) (quoting *Swinton v. United States*, 902 A.2d 772, 775 (D.C.2006)). Indeed, we have defined "serious bodily injury" to mean "injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or loss or impairment of a bodily member or function." *(Marcel) Jackson v. United States*, 970 A.2d 277, 279 (D.C.2009) (citing *(David) Jackson v. United States*, 940 A.2d 981, 986 (D.C.2008); *Bolanos v. United States*, 938 A.2d 672, 677 (D.C.

---

**2.** *See Bolanos v. United States*, 938 A.2d 672, 683 (D.C.2007) (finding sufficient evidence that appellant aided and abetted his co-defendants in an assault because he (1) was present during the crime and (2) encouraged and facilitated the offense by initiating the confrontation, being the first to draw a weapon and refusing to withdraw from the conflict before the assault).

2007); *Payne v. United States*, 932 A.2d 1095, 1099 (D.C.2007); and *Swinton*, 902 A.2d at 776–77).

In this case, there was sufficient evidence that K.B. suffered a protracted loss or impairment of the function of a bodily member, such that she experienced the requisite "serious bodily injury." K.B. testified that immediately following the attack, she "couldn't see for about two months," and that at the time of the hearing (six months after the attack), her left eye "[hadn't] recovered well like [her] right [eye]." In addition, at the hearing, she still suffered from "sharp pains in [her] left eye." In short, there was sufficient evidence to support D.E.'s adjudication of delinquency based on aggravated assault. *See, e.g., Wilson v. United States*, 785 A.2d 321, 329 (D.C.2001) (holding that reasonable jurors could conclude beyond a reasonable doubt that victim suffered "protracted loss or impairment of the function of a bodily ... organ ... and sustained a 'serious bodily injury'" based on the victim's knife wound in his left eye, which necessitated surgery, medication, and left his vision impaired).

"In reviewing challenges to the sufficiency of the evidence, 'we view the evidence in the light most favorable to the government, giving full play to the right of the [trier of fact] to determine credibility, weigh the evidence and draw justifiable inferences of fact.'" *In re P.F.*, 954 A.2d at 951–52 (quoting *Swinton*, 902 A.2d at 776 n. 6). "'[I]t is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction.'" *Nixon v. United States*, 730 A.2d 145, 148 (D.C. 1999) (quoting *Zanders v. United States*,

678 A.2d 556, 562 (D.C.1996)). This is not such a case.

## B. Exclusion of Witness Testimony

■ D.E. argues, and the government agreed at oral argument, that the trial court erred by precluding R.W. from testifying in D.E.'s defense. The parties disagree, however, about the appropriate standard of review of the harmlessness of this error. D.E. urges this court to review the error under the demanding *Chapman* standard of review,[3] while the government urges the court to apply the more lenient *Kotteakos* standard of review to the error.[4]

■ "In reviewing a decision by the trial court denying a defendant the right to call a witness, the first inquiry is whether the error amounts to the violation of a constitutional right. If a constitutional error has occurred, reversal is required unless the government shows it was harmless beyond a reasonable doubt under *Chapman*. This means that where the trial court's evidentiary ruling wholly deprived the defendant of any opportunity to cross examine a witness or present evidence concerning bias or a central issue in the case, we may only affirm if we are convinced that the error was harmless beyond a reasonable doubt." *Smith v. United States*, 809 A.2d 1216, 1223 (D.C.2002) (internal quotation marks, editing and citations omitted). But "[n]ot every evidentiary decision of the trial court ... necessarily implicates the defendant's constitutional right to cross-examine witnesses and present a defense.... If the issue is merely collateral, or where ample cross-examination has already been allowed or evidence admitted on a particular issue, trial court curtailment of the defendant's presentation does not implicate the defendant's Sixth Amendment rights, and we apply the less

---

3. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

4. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

stringent test for harmless error set forth in *Kotteakos.*" *Clark v. United States,* 639 A.2d 76, 82 (D.C.1993) (internal citations omitted).

In this case, we conclude that the trial court's decision to exclude R.W.'s testimony did not reflect an evidentiary decision on a "merely collateral" matter or an issue on which there already had been "ample cross-examination." *Clark,* 639 A.2d at 82. We reject the government's contention that "[t]he record reflects that the thrust of [R.W.'s] proffered testimony already had been introduced into evidence," especially when the government admits on the next page of its brief that "the record does not reflect what testimony [R.W.] would have given because D.E.'s counsel did not make a proffer." Although a proffer might have been useful, we cannot fault D.E.'s counsel for failing to make one. The trial judge already knew that R.W.'s testimony would be exculpatory, giving D.E.'s counsel "little incentive to make a proffer." *Smith,* 809 A.2d at 1225 n. 4. And particularly in light of the trial judge's insistence that R.W. was "not qualified to testify," we cannot say that a proffer would have made any difference in the court's ruling.

Our case law supports application of the *Chapman* standard of review. In *Smith,* we reviewed the trial court's decision to preclude Smith from calling his former co-defendant as a witness. 809 A.2d at 1222. Even though there was no proffer at trial about what testimony the witness would have given, *id.* at 1225 n. 4, the court ruled that it would not permit the co-defendant to testify because he was expected to give testimony that "would contradict the factual proffer to which he [and the government] agreed earlier and [would] possibly constitute perjury." *Id.* at 1220–21. "[W]ithout hearing [the witness's trial] testimony, the court determined that it would

be incredible in light of [the witness's] admission at the [prior] proceeding." *Id.* at 1225. On appeal, we held that the trial court's error in precluding Smith from calling his former co-defendant as a witness was not harmless beyond a reasonable doubt under the *Chapman* standard because the witness "was an eyewitness-participant in a criminal offense for which appellant was convicted," and "was the only person who could refute the police officer's testimony that appellant gave him drugs." *Id.* at 1226.

Likewise, in *Benn v. United States,* 801 A.2d 132 (D.C.2002), we reversed the trial court's decision to exclude Benn's alibi witness because that witness had violated the court's rule on witnesses. We noted that the trial "court's authority to impose the 'draconian remedy' of exclusion for a violation of the rule [on witnesses] … is narrowly circumscribed," and applied the *Chapman* harmless error standard, finding that the preclusion of the witness was not harmless beyond a reasonable doubt. *Id.* at 141, 145 (citations and editing omitted).

Here, too, the government has not satisfied its burden to show that the exclusion of R.W.'s testimony was harmless beyond a reasonable doubt. Although D.E. was allowed to present one witness in her defense, we have no way of knowing whether R.W.'s testimony would have been cumulative, or if the substance of her testimony would have gone to a central issue. *See Smith,* 809 A.2d at 1226.

We are not unmindful of the practicalities in the government's argument that, in this bench trial, the court should have been allowed to take into account her belief that R.W. had lied on the stand about her conversations in the ladies' room in making a judgment about her credibility as a trial witness. But the two circumstances strike us as different. When R.W. was questioned about what was or was not dis-

cussed in the bathroom, the judge essentially was asking her whether she herself was lying. It is perhaps understandable, even if not at all commendable, that a juvenile would lie to a judge when challenged about what she herself had said outside the courtroom. But it does not necessarily follow that the same person would lie under oath when giving testimony as a fact witness about the actions of others (here, D.E. and the others on the bus) in an alleged act of aggravated assault.

■ As we have held before, even in a bench trial, the judge's "anticipatory assessment of credibility [is] not a sufficient basis for precluding appellant from calling in [her] defense" someone who could have been an important witness. *Smith*, 809 A.2d at 1225. Thus, a judge's "knowledge that a proposed witness has made a prior inconsistent statement is not grounds for excluding his testimony at trial." *Id.* at 1226 (citing *King v. United States*, 550 A.2d 348, 355–56 (D.C.1988) (holding that the appellant was entitled to call a witness to the stand "notwithstanding [the witness's] apparent vulnerability to cross-examination")). *See also Kinard v. United States*, 416 A.2d 1232, 1233–35 (D.C.1980) (holding that the "harsh" jury instruction based on the maxim *falsus in uno, falsus in omnibus*, would no longer "be deemed appropriate in the District of Columbia court system").

Because "the trial court's ruling deprived [D.E.] of any opportunity to call the defense witness," *Smith*, 809 A.2d at 1225, and because we do not know what R.W.'s testimony about the events on the bus would have been, we conclude that the error was not harmless beyond a reasonable doubt, and we reverse the trial court's judgment and remand the case for a new adjudication hearing.

## C. Equal Protection Violation

D.E.'s final argument challenges the organization of the Superior Court's Family Court. At D.E.'s initial hearing, her counsel objected that D.E. was assigned to Judge Zoe Bush's calendar solely because D.E. was a girl, in violation of the Equal Protection Clause.[5] Counsel alleged that "[o]n or about April 1, 2006, the D.C. Superior Court began assigning all female juvenile respondents to [Judge Bush's] Court as part of a new 'Girl's Court' project," whereas before the new assignment policy, "both female and male respondents were randomly assigned to one of the five judges on the juvenile delinquency calendar." Judge Josey–Herring, Presiding Judge of the Family Court, denied D.E.'s motion, stating that it was premature because the Superior Court had not yet implemented an all-female calendar, although such a program was "in the development stage."

In June 2006, D.E. renewed her equal protection challenge. D.E.'s motion was again denied, with Judge Josey–Herring reiterating that the "juvenile calendar for females ha[d] not yet been implemented." Anticipating that such a calendar would be implemented in the near future, however, Judge Josey–Herring went on to explain why a juvenile calendar for females would not violate any female respondent's equal protection rights, writing that "[o]nce the juvenile calendar for females becomes operational, all female respondents and their probation officers will appear before one judicial officer who will ensure that appropriate interventions are identified to address the specific needs of the respondents, while ensuring that the goal of

---

5. At oral argument in this court, the government conceded that D.E.'s assignment to Judge Bush's calendar was not random but was instead based on an anticipated new calendar plan to assign all female juveniles to a single judge.

community safety is also met. The judicial officer will be knowledgeable and specially trained in gender-related issues and services...." Judge Josey–Herring also cited examples of "female responsive programming for juveniles" embraced by several other jurisdictions.

We need not and do not decide whether such a calendaring plan for female juveniles would pass constitutional muster because, as it turns out, the Superior Court never adopted the all-female juvenile calendar described in Judge Josey–Herring's orders. Although the Family Court Annual Report for 2005 stated that "all [juvenile] girls have been assigned to a single judicial officer," the Family Court's report for the following year advised that the 2005 report had been incorrect. Superior Court of the District of Columbia, *Family Court 2006 Annual Report* 74 n. 11 (Mar. 30, 2007). In the unique circumstances of this case, we decline to render an advisory opinion on such an important constitutional issue. *See, e.g., McPherson v. United States*, 692 A.2d 1342, 1348 n. 2 (D.C.1997) ("[W]e are here asked to address constitutional issues, which courts are reluctant to decide unless directly and necessarily presented, as well as the fact that we do not issue advisory opinions, even at the behest of all parties.") (Steadman, J., concurring) (citing *District of Columbia v. Wical Ltd. Partnership*, 630 A.2d 174, 182 (D.C.1993)).

## D. Assignment of the Case on Remand

As we noted at the outset (*see* p. 1207, *supra*), D.E.'s gender-based assignment to a particular judge, as well as the exclusion of the testimony of one of the witnesses D.E. wanted to call in her defense, may leave lingering concerns that might affect D.E.'s and the public's perception of the proceedings on remand. Our court has not had occasion to analyze in detail the factors that make it appropriate to assign a case on remand to a different judge, but we draw the Family Court's attention to the Second Circuit's decision in *United States v. Robin*, 553 F.2d 8 (1977) (en banc). The *Robin* court set forth three principal factors to consider in determining whether further proceedings should be conducted before a different judge: "(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." [6] *Id.*

In *Robin*, as here, remand to a different judge would "not imply any personal criticism of the trial or sentencing judge." *Id.* at 10. Instead, it would simply recognize that there may be cases where "both for the judge's sake and the appearance of justice, an assignment to a different judge is salutary and in the public interest, especially as it minimizes even a suspicion of

---

**6.** *Robin* is the leading case on this issue, having been cited with approval by several other federal courts of appeal. *See, e.g., United States v. Wolff*, 127 F.3d 84, 88 (D.C.Cir.1997) (citing *Robin* with approval but finding it unnecessary to remand the particular case to a different judge); *United States v. Garcia*, 694 F.2d 294, 296 (1st Cir.1982) (following *Robin*); *United States v. Guglielmi*, 929 F.2d 1001, 1007 (4th Cir.1991) (following *Robin*); *United States v. Long*, 656 F.2d 1162, 1166 n. 7 (5th Cir.1981) (following *Robin*); *Bercheny v. Johnson*, 633 F.2d 473, 476–77 (6th Cir. 1980) (following *Robin*); *United States v. Sears, Roebuck & Co.*, 785 F.2d 777, 781 (9th Cir.1986) (following *Robin*); *United States v. White*, 846 F.2d 678, 696 (11th Cir.1988) (following *Robin*).

partiality." *Id.* (internal citations omitted).

### E. Conclusion

Accordingly, we reverse D.E.'s adjudication of delinquency based on the court's error in excluding R.W. from testifying, and remand the case for further proceedings.

*Reversed and remanded.*